HAMILTON, Circuit Judge.
Wayne Kubsch appeals the denial of his habeas corpus petition. After being convicted of murdering his wife, her son, and her ex-husband, Kubsch was. sentenced to death. Kubsch’s three principal arguments on appeal are that his conviction and sentence are unconstitutional because (a) the Indiana trial court excluded evidence of a witness’s exculpatory but hearsay statement to police, (b) he was denied effective assistance of counsel in seeking admission of the witness’s hearsay statement, and (c) his waiver of counsel and choice to represent himself at the sentencing phase of his trial were not knowing and voluntary.
We reject all three claims. Kubsch argues for a constitutional right to defend himself with otherwise inadmissible hearsay, at least if the hearsay seems sufficiently reliable and is sufficiently important to his defense. See Chambers v. Mississippi, 410 U.S. 284, 300-02, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Kubsch’s evidence is not sufficiently reliable to fit that narrow constitutional exception and to have required Indiana courts to disregard long-established rules against using ex parte witness interviews as substantive evidence at trial. His able trial counsel tried hard to have the statement admitted; they were not successful but also were not constitutionally ineffective.
As for the waiver of counsel claim, the Indiana Supreme Court rejected the claim *788 in a careful discussion tailored to the facts of this case. Its rejection of the claim was not contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. See 28 U.S.C. § 2254(d)(1); Harrington v. Richter, 562 U.S. 86, 102-03, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011).
In addition to the exculpatory hearsay claim, the related ineffective assistance claim, and the waiver of counsel claim that we address in detail, Kubsch raises a number of other arguments on appeal, all of which are challenges to the effectiveness of his counsel. We have considered all of these additional arguments, and we reject them for the reasons Chief Judge Simon explained in his thorough opinion. See Kubsch v. Superintendent, No. 3:11CV42-PPS, 2013 WL 6229136 (N.D.Ind. Dec. 2, 2013). Accordingly, we affirm the denial of relief as to both Kubsch’s convictions and the death sentence.
I. Factual and Procedural Background
A. Court Proceedings
The State of Indiana charged Kubsch with murdering Beth Kubsch, Aaron Milewski, and Rick Milewski: his wife, her son, and her ex-husband. The three were murdered in Kubsch’s home on September 18,1998. Kubsch was first tried and found guilty in May 2000. The jury recommended and the judge imposed the death penalty. On direct appeal the Indiana Supreme Court held that the first trial violated Kubsch’s constitutional rights when the prosecution used his post-Miranda silence as evidence against him. Based on that and other errors, the court vacated the convictions and ordered a new trial. See Kubsch v. State, 784 N.E.2d 905 (Ind. 2003).
Kubsch’s second trial in March 2005 is our focus. Once more a jury convicted Kubsch of the three murders. There were two big differences in the second trial, in addition to avoiding the errors that had required the new trial. First, Kubsch offered as evidence the videotaped interview of Amanda Buck, a nine-year-old neighbor of Aaron and Rick Milewski. Amanda told a police detective four days after the murders that she had seen both Aaron and Rick alive and well at their home on the day of the murders at a time for which Kubsch has a solid alibi. The judge excluded her recorded statement as hearsay and as having no impeachment value. Second, unlike the first trial, Kubsch decided to waive counsel and represent himself in the sentencing phase of the trial. He also declined to present any mitigating evidence. He told the jury he agreed with the State that no mitigating factors outweighed the aggravating factors supporting a death sentence, but he insisted on his innocence. He ended his brief statement to the jury by saying he did not care what penalty was imposed.
Again the jury’s verdict was for death and the judge imposed the death penalty. The state courts affirmed the convictions and sentence on direct appeal, Kubsch v. State, 866 N.E.2d 726 (Ind.2007), and on post-conviction review, Kubsch v. State, 934 N.E.2d 1138 (Ind.2010).
Kubsch then petitioned for a writ of habeas corpus in federal court, raising many more issues than we address in this opinion. The district court denied relief on all claims, Kubsch v. Superintendent, No. 3:11CV42-PPS, 2013 WL 6229136 (N.D.Ind. Dec. 2, 2013), and then denied Kubsch’s Rule 59 motion, Kubsch v. Superintendent, No. 3:11CV42-PPS, 2014 WL 1260021 (N.D.Ind. March 24, 2014). Kubsch appeals. We review the district court’s decision de novo. E.g., Harris v. *789 Thompson, 698 F.3 d 609, 622 (7th Cir. 2012).
B. The Case Against Kubseh
Chief Judge Simon aptly described the case against Kubseh as a “slow-moving accumulation of a glacier of circumstantial evidence.” 2013 WL 6229136, at *3. A critical factor was that Kubsch’s account of his own actions changed dramatically between the night of the murders and his trial testimony, after he knew the constraints imposed by physical and other evidence such as telephone records.
Kubseh lived with his wife Beth in Mishawaka, Indiana. They shared the home with Beth’s twelve-year-old son, Anthony Earley. September 18, 1998 was Beth’s birthday. She had planned to meet Kubseh for lunch. Beth was supposed to pick up Anthony late in the afternoon after a school dance. When she did not appear, Anthony got a ride home with a friend. At about 5:30, he found Beth’s car in the driveway, along with a truck that her ex-husband Rick Milewski was using. The house was locked. Only Wayne, Beth, and Anthony had keys. No one seemed to be home. There was no sign of forced entry.
As Anthony looked around the main floor of the house, though, he saw bloodstains and signs of a struggle. He opened the door to the basement. He saw Rick lying at the foot of the stairs. The handle of a large kitchen knife was sticking out of his chest. Anthony went down the stairs, realized Rick was dead, and also found the body of his eleven-year-old step-brother Aaron lying next to Rick.
Anthony ran for help. Mishawaka police officers arrived about 5:45 p.m. Both Aaron and Rick had multiple stab wounds. The police officers found no sign of gunshot wounds. They also found no sign of Beth. After finding no one else in the house, the police secured the scene until they could obtain a search warrant.
That day Wayne Kubseh had finished work at an area factory shortly before 2:00 p.m. Late in the afternoon, he was returning to Mishawaka from picking up his son in Three Rivers, Michigan. He dropped off his son at Kubsch’s grandmother’s home. Kubseh arrived home about 6:45 and found the house surrounded by police. Kubseh was told that Aaron and Rick were dead and that no one knew where Beth was.
Kubseh soon went with police officers to the South Bend police department for questioning by detectives. That initial interview was audio- and video-recorded. Kubseh appeared preoccupied and careful, not distraught or frantic. He made no reference to the search for his missing wife, though there were obviously powerful reasons to be worried about her safety. He showed little emotion.
In that first interview on the night of the murders, Kubseh gave the police his first account of his movements and activities that day. Kubseh said that he and Beth had planned to meet for lunch to celebrate her birthday, but that he had called her to cancel because he had been late for work that morning. He also said that he had gotten permission to leave work early for lunch so he could buy Beth a birthday present (something he did not actually do until much later in the day). He told the police that he had gone home at lunch but could not get inside because he had forgotten his house key. He also did not mention that he had gone home a second time — shortly after work — before going to pick up his son in Michigan.
Kubseh ended the interview. His friend Dave Nichols and Nichols’ wife testified that Kubseh called them about 8:00 or 8:30 that evening and said two things known to the killer but not yet known to the police. *790 He told Nichols that Beth was “gone,” which Nichols understood to mean that she was dead, not missing.[2] At that time, Beth’s body had not yet been found. And while “gone” might be explained away as ambiguous, Kubsch also told Nichols that Rick and Aaron had been stabbed and shot. Not until autopsies were done the next day did the police learn that Rick and Aaron, in addition to them multiple stab wounds, had each been shot in the mouth.
At about 9:00 p.m., police officers on the scene discovered Beth’s body. She was just a few feet from Rick and Aaron, but she was hidden underneath the staircase behind blankets that young Anthony had hung up as a sort of “fort” or hiding place a few weeks earlier. She had been stabbed eleven times. Her head was almost entirely covered in gray duct tape. Her body was “hog-tied” with the same tape, her wrists and ankles all bound together behind her back. (An autopsy also showed a blow to the back of her head and defensive wounds on her hands and wrists.) The officers quickly told the detectives at the South Bend station that Beth had been found murdered. The detectives then brought Kubsch back for more questioning later that evening. He declined to talk with them at that point, but he gave them permission to search his car.
The investigation of physical evidence turned up no evidence pointing conclusively to Kubsch. The only blood found on the scene belonged to the victims. The police did not find evidence of the victims’ blood on Kubsch or his clothing. They also found no DNA or fingerprint evidence that pointed to him or anyone else as the killer.
Various items of physical evidence were consistent with Kubsch’s guilt. In isolation none is conclusive. Taken together they point toward Kubsch as the killer, though not definitively. In Kubsch’s car the police found the wrapper of a roll of duct tape of the type used to bind Beth. A bloody roll of duct tape at the top of the stairs matched the wrapper and the tape on Beth’s body. A cloth fiber from the tape roll matched a fiber from the carpet of Kubsch’s car. A receipt for purchase of the duct tape, three days before the murders, was found in Kubsch’s car.
The police also found in Kubsch’s car a wadded-up receipt from a deposit Beth had made the morning of the murders at the drive-through window of her credit union. The presence of that receipt in Kubsch’s car contradicted the account he had given police the evening of the murders. (Even Kubsch’s explanation at trial, that he found it next to the home telephone on his first stop at home that day, was improbable if not physically impossible. That explanation would have required Beth to do some improbable backtracking between two related errands.)
Of course, the locked house was also evidence that pointed toward Kubsch. The knife in Rick’s chest was from the set of kitchen knives upstairs. A kitchen pan also had Beth’s blood on it. As the prosecutor pointed out in closing argument, if the killer had been a stranger, it seems improbable that he would have counted on tools found in the home — the knife, the pan, and the duct tape — to carry out the murders.
Telephone records played an important role in the investigation and at trial. Recall that Kubsch had told police that he returned home at lunch but could not get in without his key. Home telephone records showed that was false. A call had been placed from the home telephone *791 while Beth was running her errands that morning. Kubsch testified at trial that he had in fact gotten into the house — through the garage — where he said he made the call, smoked part of a marijuana cigarette, and then left to return to work around noon.[3]
Kubsch also made'numerous calls with his cell phone on the day of the murders. Records of those calls showed his approximate locations at different times during the day. He left work for the day just before 2:00. Though he told the police the night of the murders that he had then gone directly to Michigan to pick up his son, he later admitted he had first actually returned to his home. He claimed that he had stopped at home for a few minutes between 2:30 and 2:45 and that no one else was home. • At 2:51 Kubsch placed a cell phone call from a cell sector near his home. Cell phone records and other evidence showed that Kubsch then drove to Michigan to pick up his son. The State’s theory has been that Kubsch had an opportunity to commit the murders in the time between approximately 2:00 and 3:00.
Another important discrepancy in Kubsch’s story was that at 12:09 p.m. he called Rick Milewski and, according to Rick’s brother, asked Rick to meet him at his house at 3:00 p.m. to help move a refrigerator. That request is hard to understand if Kubsch was planning to be on his way. to Michigan by then. (The prosecution’s theory was that Kubsch planned to have Rick find Beth’s body but that Rick and Aaron showed up too early, before Kubsch had left, so he killed them too.)
Yet another discrepancy in Kubsch’s story came from Beth’s mother, Diane Rasor. She testified that when she talked with Kubsch on the afternoon of the murders, she mentioned that she had not been able to get in touch with Beth all day (Beth’s birthday, recall). Kubsch reassured her, telling her that he had talked with Beth by phone and knew Beth was running a number of errands and was not at home to answer the phone. Several days after the murders, Kubsch told Rasor that he had not talked to Beth the day she was killed and he wished he had.
Kubsch also had a significant financial motive to murder Beth. The prosecution showed that the couple was in deep financial distress in 1998. Their cash flow was consistently negative. Early that year Kubsch had refinanced eight of the rental properties he owned, converting all available equity into cash and substantially increasing the total debt to about $424,000. Several credit cards or lines of credit were • near their maximum limits. About three months before the murders, Kubsch had bought a new insurance policy on Beth’s life for $575,000, with himself as the sole beneficiary. Kubsch claimed at trial that he had not realized they were in such difficult financial straits, but he also testified that he took care of the couple’s bills, as well as their credit cards and lines of credit, and of course he had undertaken all the refinancing earlier that year.
As Chief Judge Simon summarized:
The case against Kubsch was entirely circumstantial. There was no eyewitness, no DNA evidence, no fingerprint testimony, indeed no forensic evidence at all that' linked Kubsch to the murders. There was, however, moderately strong evidence of motive and opportunity. But most damning to Kubsch was a series of lies, inexplicable omissions, and inconsistencies in what Kubsch told the *792 police and later testified on the witness stand, and these statements — in conjunction with a few pieces of circumstantial evidence — are what almost assuredly-got Kubseh convicted.
2013 WL 6229136, at *1.
II. Exclusion of Exculpatory Hearsay Evidence
Kubseh argues that he was convicted of the murders through a violation of his federal due process right to present a defense. The trial court did not allow him to introduce as substantive evidence a witness’s videotaped interview with a police detective four days after the murders. Nine-year-old Amanda Buck and her mother Monica were interviewed together by the detective. The Bucks lived across the street from two of the victims, Rick and Aaron Milewski. In the recorded twenty-minute interview, Amanda told the detective that she had seen Rick and Aaron alive and well at their home when she got home from school and daycare, between 3:30 and 3:45 p.m. on the day of the murders, Friday, September 18,1998.
The date and time are critical. Based on telephone records and other evidence, the State argued at trial that Kubseh murdered the three victims between approximately 2:00 and 3:00 p.m. Kubsch’s own testimony placed him at his home between approximately 2:30 and 2:45, though he claimed no one else was there. Cell phone records show that by 3:30 p.m. that day, Kubseh was well on his way to the town of Three Rivers, Michigan to pick up his son for the weekend. He did not return to his home in Mishawaka, Indiana until about 6:45, after the bodies of Rick and Aaron had been discovered there.
The importance of the constitutional evidentiary issue cannot be overstated. If the account given by Amanda in her recorded interview is correct, then Kubseh could not have committed the three murders for which he has been sentenced to death. And apart from Kubsch’s own claims of innocence — impeached as they are by his shifting accounts of his movements that day — Amanda’s recorded interview is the only support for Kubsch’s alibi defense.
Kubseh bases his due process claim on Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and its progeny. In Chambers the Supreme Court reversed a murder conviction on direct appeal. The Court held that the defendant was denied a fair trial when the trial court prevented him from impeaching a witness he had called and excluded hearsay evidence that the same witness had confessed to three different acquaintances that he was the killer. Kubseh relies on the hearsay portion of the Chambers analysis and its often-quoted statement that “the hearsay rule may not be applied mechanistically to defeat the ends of justice.” 410 U.S. at 302, 93 S.Ct. 1038. The actual holding of Chambers is considerably narrower, however, for it depended on the combination of the trial court’s limits on cross-examination and its exclusion of the multiple hearsay confessions, and the particular facts and circumstances of the case, which we describe in more detail below. See id. at 302-03, 93 S.Ct. 1038.
We address this issue in four steps. Part A explains the details of Amanda’s statement and its treatment by the trial court and the Indiana Supreme Court. Part B explains the Chambers line of cases and the general constitutional standard for the right to present a defense, as well as its application in cases involving hearsay. Part C considers the factors indicating that Amanda’s recorded statement is or is not reliable for purposes of Chambers. Part D addresses the issue of our standard of review, which turns out to be rather *793 involved, and explains our conclusion that Kubsch is not entitled to relief.
A. The Statement in the State Courts
Four days after the murders, Sergeant Mark Reihl interviewed nine-year-old Amanda Buck and her mother Monica Buck together. The interview was in a police station and was audio- and video-recorded. The Bucks lived across the street from Rick and Aaron Milewski, and Sergeant Reihl asked them what they remembered from the day of the murders. Amanda answered most of the questions, but Monica added her own recollections, including specific times. Amanda recalled seeing both Aaron and Rick at their home across the street after she got home from school and daycare, which would have been between 3:30 and 3:45 on the afternoon of the murders.
Amanda’s account was specific about many details, including what she was doing and which truck Rick was driving. She specifically recalled seeing Rick go into his kitchen and return with a glass. Her account was specific about the time and date. She recalled that she and Aaron were planning to go on a school field-trip the next day, a Saturday, and that Aaron had not shown up for the trip. Her mother Monica recalled having seen Aaron (but not Rick) when she got home shortly after 4:00 p.m. after going to the bank to deposit her paycheck, which she usually did on Friday.
The interview was disclosed to the defense, but Kubsch did not call Amanda or Monica as witnesses at his first trial, which took place less than two years after they spoke to the police. At the second trial in 2005, though, Kubsch called then sixteen-year-old Amanda as a witness. She testified that she did not remember whether she saw Rick and Aaron on the afternoon of the murders. She also testified that she did not even remember being interviewed by the police seven years earlier. After her brief testimony, and outside the presence of the jury, Amanda reviewed the recording of her interview. That apparently did not refresh her recollection because Kubsch offered no further testimony from her. Kubsch never called Monica to testify.
The real purpose of calling the sixteen-year-old Amanda was to put into evidence the video recording of the nine-year-old Amanda. Kubsch first tried to introduce the recording as substantive evidence. The recording was hearsay, of course. It was an out-of-court statement offered to prove the truth of its content. At trial, Kubsch argued that it should be admitted as a recorded recollection. Indiana Rule of Evidence 803(5), like its federal counterpart, recognizes an exception to the rule against hearsay for a “recorded recollection.” Recorded recollections are records of what a witness once knew when her memory was fresh but now no longer recalls. A recorded recollection also “accurately reflects the witness’s knowledge.” Ind. R. Evid. 803(5)(C); see also Fed. R.Evid. 803(5)(C). Examples might include a diary or journal entry or a memorandum to file, as well as recorded interviews.
This recorded statement does not meet the last requirement of Rule 803(5). Amanda would have needed to “vouch for the accuracy” of the statement for it to qualify as a recorded recollection. Kubsch v. State (Kubsch II), 866 N.E.2d 726, 734 (Ind.2007), quoting Gee v. State, 271 Ind. 28, 389 N.E.2d 303, 309 (1979). As the trial court found and the Indiana Supreme Court affirmed, “Buck could not vouch for the accuracy of a recording that she could not even remember making.” Kubsch II, 866 N.E.2d at 735. The videotaped state *794 ment did not qualify as a recorded recollection under Indiana evidence law. M[4]
Kubseh next offered the videotaped statement to impeach Amanda’s trial testimony with extrinsic evidence of a prior inconsistent statement. See Ind. R. Evid. 613(b). As noted, Amanda testified that she simply did not remember talking to the police and did not remember whether she saw her friend and neighbor Aaron between 3:30 and 3:45 p.m. the day of the murders.
The trial court sustained the State’s objection to admitting the statement’ as impeachment evidence because Amanda “testified to no positive fact that is subject to impeachment.” Tr. 3120. The Indiana Supreme Court agreed with respect to Amanda’s trial testimony that she did not remember what happened or whom she saw on the day of the murders. Kubseh II, 866 N.E.2d at 735. However, Amanda also testified at one point that she “probably didn’t see” Aaron at home between 3:30 and 3:45 p.m. on the day of the murders. Tr. 2985. The Indiana Supreme Court held that this testimony was properly subject to impeachment and that the trial court had erred by not allowing the attempted impeachment. Kubseh II, 866 N.E.2d at 735.
The Indiana Supreme Court also held, however, that the error was harmless. Id. In the debate in the trial court-about the recording, the State said that if Kubseh were allowed to use Amanda’s recorded statement to impeach her trial testimony, the State would respond with additional evidence impeaching the impeachment. The prosecutor asserted that three days after the recorded interview, Lonnie Buck (Monica’s father and Amanda’s grandfather) had called Sergeant Reihl and reported that both Amanda and Monica had been mistaken about the day they recalled and that they had described for him not the day of the murders but the day before. Monica had followed up with a later statement saying that she and Amanda had not seen Aaron on the day of the murders. At the time of the 2005 trial, the State was prepared to call both Monica Buck and Sergeant Reihl to impeach the proposed impeachment of Amanda.
The Indiana Supreme Court explained its finding of harmless error:
Amanda’s testimony should have been impeached, but other testimony would have supported hers had she been impeached, and therefore, her testimony likely did not contribute to the conviction. See Pavey v. State, 764 N.E.2d 692, 703 (Ind.Ct.App.2002) (“An error in the admission of evidence is not prejudicial if the evidence is merely cumulative of other evidence in the record.”).
866 N.E.2d at 735. Just before this passage, the court dropped a footnote reject *795 ing Kubsch’s federal constitutional claim under Chambers:
The availability of this testimony is also the reason why Kubsch’s claim that he was denied his federal constitutional right to present a defense fails. See Chambers v. Mississippi 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (protecting defendant’s due process right by recognizing an exception to application of evidence rules where evidence found to be trustworthy).
Id. at 735 n. 7.
Unless we keep in mind the difference between substantive evidence and impeachment evidence, which may be considered not for the truth of the matter asserted but only to evaluate the credibility of other evidence, these terse passages finding harmless error may seem mistaken. After all, if Amanda’s statement were admissible as substantive evidence to prove that what she said in the interview was true, then the mere fact that there was some contradictory evidence would not justify its exclusion. (The State’s proffered impeachment did not include any admission by Amanda herself that she had been mistaken.) Conflicting evidence would simply present an ordinary question for a jury to resolve, as the trial judge recognized, see Tr. 3015, though a question of great importance because the statement would, if believed, exonerate Kubsch.
When we focus, however, as the trial judge did on the limited role of impeachment evidence, the harmless error finding is clearly sound as a matter of state evidence law. The only thing Amanda-said in her trial testimony that was subject to impeachment was that she “probably didn’t see” Aaron on the afternoon of the murders. As the trial judge pointed out, “She gave no substantive evidence in this case whatsoever.” Tr. 3032. Amanda’s narrow substantive statement that she “probably didn’t see” Aaron on the afternoon of the murders was not inculpatory. It had essentially no probative value for the jury, so there would have been no point in impeaching her, and the exclusion of her statement for impeachment purposes could not have contributed to Kubsch’s convictions.
The Indiana Supreme Court’s rejection of the distinct Chambers claim in footnote 7 is the focus of our scrutiny. In the trial court, Kubsch had not asserted a distinct federal, constitutional claim under Chambers. He made that federal argument in his direct appeal, though, and the Indiana Supreme Court elected to decide the issue on its merits rather than find a procedural default. Footnote 7 was quite sensible to the extent that the recording was being offered only to impeach the non-ineulpatory “probably didn’t see him” portion of Amanda’s trial testimony. The problem is that that reasoning seems not to have actually engaged with Kubsch’s argument under the federal Constitution that the recording should have been admitted as substantive evidence. Again, the mere fact that the State would have offered contradictory evidence would have presented a jury question, not a basis for excluding the evidence in the first place. We explore these issues further in Part D on the standard of our review of the state court’s decision.
B. The Right to Present a Defense
The exclusion of Amanda’s recorded statement was not contrary to Indiana evidence law, as the Indiana Supreme Court decided. That conclusion does not resolve the federal constitutional question, though it informs our answer to that question. In a series of decisions led by Chambers v. Mississippi 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the Supreme Court has held that the accused in a crimi *796 nal case has a federal constitutional right to offer a defense. Both the accused and the state “must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.” Id. at 302, 93 S.Ct. 1038. In some circumstances, however, the constitutional right to defend takes precedence over rules of evidence. This can include the hearsay rules, as Chambers itself showed.
Chambers is the closest Supreme Court case on its facts, so to understand the scope of this right to defend with hearsay, we consider that case in some' detail. Leon Chambers was accused of murdering a police officer in a chaotic disturbance, essentially a small riot, as police were trying to arrest another person. Another man named McDonald had confessed to the murder: “McDonald had admitted responsibility for the murder on four separate occasions, once when he gave the sworn statement to Chambers’ counsel and three other times prior to that occasion in private conversations with friends.” Id. at 289, 93 S.Ct. 1038. McDonald was arrested after confessing to Chambers’ counsel, but he was released when he repudiated that confession at his own preliminary hearing. Id. at 287-88, 93 S.Ct. 1038.
Chambers called McDonald as a witness at trial. McDonald’s written confession was admitted into evidence, but McDonald again repudiated it. 410 U.S. at 291, 93 S.Ct. 1038. Chambers was not allowed to test McDonald’s memory or otherwise to challenge his testimony. The state courts relied on the old “voucher” rule under which a party who called a witness was deemed to have vouched for his credibility and so was not allowed to impeach him even if he was actually adverse. The Supreme Court found, however, that the voucher rule was no longer realistic and had been applied to limit unfairly Chambers’ examination of a critical witness who was in fact adverse. Id. at 295-98, 93 S.Ct. 1038.
After his attempts to impeach McDonald were stymied, Chambers then offered the testimony of three friends to whom McDonald had confessed. Their testimony about McDonald’s confessions was excluded as hearsay. Id. at 292-93, 93 S.Ct. 1038. The jury convicted Chambers of the murder.[5]
On direct appeal, the Supreme Court reversed based on the combination of the voucher rule’s barring impeachment of McDonald and the exclusion of the hearsay confessions. Id. at 302-03, 93 S.Ct. 1038. The Court noted that declarations against interest have long been treated as sufficiently reliable to be excepted from rules against hearsay. Id. at 298-99, 93 S.Ct. 1038. The Court found that the excluded confessions “bore persuasive assurances of trustworthiness” that brought them “well within the basic rationale of the exception for declarations against interest” and were “critical to Chambers’ defense.” Id. at 302, 93 S.Ct. 1038. The Court concluded: “In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.” Id. The combination of the limits on impeachment and the exclusion of the confessions led the Court to hold that “under *797 the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.” Id. at 303, 93 S.Ct. 1038.
Chambers does not stand alone. It is the key precedent in a line of cases considering constitutional challenges to rules of evidence that restrict the defense of an accused. See Washington v. Texas, 388 U.S. 14, 22, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (rejecting state evidence rule that allowed accused accomplices to testify for prosecution but not for defense); Green v. Georgia, 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (per curiam) (vacating death sentence where defendant was barred from using same out-of-court confession that prosecution used to obtain death penalty against declarant); Crane v. Kentucky, 476 U.S. 683, 691, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (rejecting state court’s wholesale exclusion of testimony about circumstances of defendant’s confession); Rock v. Arkansas, 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (rejecting state rule excluding all hypnotically refreshed testimony as applied to bar defendant’s own testimony); Montana v. Egelhoff, 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (upholding state rule barring consideration of evidence of voluntary intoxication in determining mens rea); United States v. Scheffer, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (upholding military rule of evidence barring use of polygraph test showing “no deception” in denial of drug use by defendant); Holmes v. South Carolina, 547 U.S. 319, 330, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (rejecting state rule barring defendant from introducing evidence of third-party guilt when prosecution has introduced forensic evidence that, if credited, is strong proof of defendant’s guilt).
In the Chambers line of cases, the Court has balanced competing interests, weighing the interests in putting on a full and fair defense against the interests in orderly procedures for adjudication and use of reliable evidence that can withstand adversarial scrutiny. In striking this balance, the Court has recognized that “State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.” Holmes, 547 U.S. at 324, 126 S.Ct. 1727 (brackets and internal quotation marks omitted), quoting Scheffer, 523 U.S. at 308, 118 S.Ct. 1261. Those rules are then put into practice by trial judges “called upon to make dozens, sometimes hundreds, of decisions concerning the admissibility of evidence” in a criminal trial. Crane, 476 U.S. at 689, 106 S.Ct. 2142. The latitude exercised by rulemakers and the trial judges they empower proves that the right to “present a complete defense” is not absolute. Id. at 690, 106 S.Ct. 2142, quoting California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Nevertheless, “to say that the right to introduce relevant evidence is not absolute is not to say that the Due Process Clause places no limits upon restriction of that right.” Montana v. Egelhoff, 518 U.S. 37, 42-43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality opinion).
The general constitutional standard can now be stated this way: rules of evidence restricting the right to present a defense cannot be “arbitrary or disproportionate to the purposes they are designed to serve.” Rock, 483 U.S. at 56, 107 S.Ct. 2704. The most recent in the Chambers line of cases explained that the Court has struck down as “arbitrary” those restrictions that “excluded important defense evidence but that did not serve any legitimate interests.” Holmes, 547 U.S. at 325, 126 S.Ct. 1727. We have applied this constitutional standard to grant habeas relief in strong cases. E.g., Harris v. Thompson, *798 698 F.3d 609 (7th Cir.2012); Sussman v. Jenkins, 636 F.3d 329 (7th Cir.2011). We have also denied relief where there was room for reasonable jurists to disagree. E.g., Dunlap v. Hepp, 436 F.3d 739 (7th Cir.2006); Horton v. Litscher, 427 F.3d 498, 504 (7th Cir.2005).
1. The Parity Principle
One way a state rule of evidence may be arbitrary is where it restricts the defense but not the prosecution. Several cases in the Chambers line have emphasized this “ ‘parity’ principle: a state rule that restricts the presentation of testimony for the defense but not the prosecution will generally be deemed arbitrary.” Harris, 698 F.3d at 632, citing Akhil Reed Amar, Sixth Amendment First Principles, 84 Geo. L.J. 641, 699 (1996). For example, Washington v. Texas struck down a state rule allowing alleged accomplices to testify against each other but forbidding them from testifying for each other. 388 U.S. at 22, 87 S.Ct. 1920. Green v. Georgia struck down another violation of the parity principle. In that case state courts excluded hearsay evidence that the defendant tried to introduce in his capital sentencing hearing after the state had used that same hearsay evidence against his accomplice in the accomplice’s trial. 442 U.S. at 96-97, 99 S.Ct. 2150.
The parity approach to evaluating reliability enables “defendants to benefit from the balance that the state tries to strike when its own evidence-seeking self-interest is at stake.” See Amar, 84 Geo. L.J. at 699. If the rule excluding evidence is in fact the product of a genuine balancing of interests by the state, that weighs in favor of respecting the balance by regarding the evidence as unreliable no matter which side it favors. See id.
Nothing in the record indicates that the State would have been able to introduce Amanda’s recorded statement if it had been inculpatory rather than exculpatory. Whether inculpatory or exculpatory, Amanda “could not vouch for the accuracy of a recording that she could not even remember making,” and her statement would not qualify as a recorded recollection regardless. Kubsch II, 866 N.E.2d at 735.
The State thus seems to have struck a genuine balance that excludes hearsay evidence like this no matter whom it benefits. But that is not the end of the matter. The Chambers line of cases can also protect the accused from a restrictive evidentiary rule that is disproportionate to its purposes. That leads us to the question of reliability.
2. Reliability
Reliability is the core of the hearsay rule and its many exceptions. See Federal Rules of Evidence, Article VIII, Advisory Committee Notes (1972). Our adversarial system relies first and foremost on in-court testimony. In court, a trier of fact may watch and listen to a declarant whose testimony is offered to prove the truth of its contents, and adverse parties may further test such testimony through vigorous cross-examination. “The principal justification for the hearsay rule is that most hearsay statements, being made out of. court, are not subject to cross-examination.” Rice v. McCann, 339 F.3d 546, 551 (7th Cir.2003) (Posner, J., dissenting); accord, Federal Rules of Evidence, Article VIII, Advisory Committee Notes; 30 Wright & Graham, Federal Practice and Procedure § 6325 (1997).
When deciding whether to fashion a hearsay exception, the central question is whether the circumstances and content of an out-of-court statement give the court confidence that the statement is sufficiently reliable to admit as evidence despite the inability to test it directly in court. See, *799 e.g., Chambers, 410 U.S. at 298-99, 93 S.Ct. 1038 (“A number of exceptions have developed over the years to allow admission of hearsay statements made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination.”); Fed.R.Evid. 807(a)(1) (residual hearsay exception requires “equivalent circumstantial guarantees of trustworthiness”).
The hearsay portion of Chambers thus turned on whether McDonald’s hearsay confessions bore sufficient indications of reliability that a mechanical application of the state hearsay rule violated Chambers’ right to defend himself at trial. The Chambers Court identified four factors that together provided “considerable assurance” of the reliability of the excluded confessions. First, each confession was made spontaneously to a close acquaintance of the declarant shortly after the murder. Second, each statement was corroborated by other evidence. Third, the statements were against the declarant’s own interest. Fourth, the declarant was available at trial for cross-examination. Id. at 300-01, 93 S.Ct. 1038.
Green v. Georgia also addressed the exclusion of hearsay testimony. Two men, Green and Moore, participated in a rape and murder. Moore had been convicted and sentenced to death. At his trial and sentencing, the state had used against him his out-of-court confession to a friend that he had fired the fatal shots. Yet when Green was being sentenced and offered the same evidence to show that he was less culpable than Moore, it was excluded as hearsay. 442 U.S. at 96-97, 99 S.Ct. 2150. The Supreme Court reversed, emphasizing the state’s use of the evidence against Moore as perhaps the “most important” reason for trusting the reliability of the testimony. Id. at 97, 99 S.Ct. 2150. But the Court also made note of other “substantial reasons” to treat the confession as reliable. The confession was made spontaneously to a close friend, it was against Moore’s penal interest, there was no reason to believe Moore had any ulteri- or motive to make it, and there was ample corroborating evidence. “In these unique' circumstances,” the Court wrote, “the hearsay rule may not be applied mechanistically to defeat the ends of justice.” Id., quoting Chambers, 410 U.S. at 302, 93 S.Ct. 1038.
C. Amanda’s Statement — Reliable or Not?
Chambers and Green both reversed the exclusion of another person’s hearsay confession against penal interest when there were substantial indications that the confession was reliable. The problem posed by Amanda Buck’s recorded interview, and specifically by whether she saw Aaron and Rick Milewski on the afternoon of the murders or on another day, is quite different.
Weighing in favor of reliability, the interview was recorded, so there is no doubt about what was said, and the interview took place just a few days after the events in question, when memories were fresh. In addition, Amanda was quite detailed and specific in her account. She had nothing to gain by lying and there is no indication that she did so.
Other factors weigh against her statement’s reliability, however. The extent of corroboration was central to the reasoning in Chambers. McDonald’s four independent confessions corroborated each other. They were also corroborated by the testimony of other witnesses: one who saw McDonald shoot the officer, another who saw him with a gun immediately afterward, and another who knew he had owned a gun like the murder weapon and *800 later replaced it with another similar gun. Chambers, 410 U.S. at 293 n. 5, 300, 93 5.Ct. 1038. Furthermore, in Green the Court described the corroborating evidence there as “ample,” and of course the state had treated the other man’s confession to firing the fatal shots as sufficiently reliable to use it to sentence him to death. 442 U.S. at 97, 99 S.Ct. 2150.
In this case, by contrast, there simply is no corroboration of Amanda’s statement on the critical point, which is whether Aaron and Rick were at their home alive and well between 3:30 and 3:45 on the day they were murdered.[6] (No corroboration, that is, other than Monica’s initial statement that she also saw Aaron at home that afternoon, a statement that Monica later corrected, that was never offered as evidence, and that could not have been admitted as substantive evidence to corroborate Amanda’s statement.) The minimal corroboration for Amanda’s recorded statement distinguishes this case from Chambers and Green and their reasoning. See Rice, 339 F.3d at 550 (affirming denial of habeas relief in part because state court found hearsay statements in question were not corroborated).
The availability of cross-examination was also central to Chambers: “Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury.” 410 U.S. at 301, 93 S.Ct. 1038.
In this respect, as well, the evidence here is quite different from the confessions in Chambers. Unlike the declarant in Chambers, Amanda was essentially unavailable for cross-examination. She took the stand at trial but testified that she did not remember being interviewed by the police or what she said to them. “A declarant is considered to be unavailable as a witness if the declarant ... testifies to not remembering the subject matter.” Ind. R. Evid. 804(a)(3); Fed.R.Evid. 804(a)(3).
In addition, during the recorded interview, Amanda was never pushed on the critical details — the date and time she saw Aaron and Rick at their home. The interviewing officer was simply taking her account as she spoke in an interview in the early stages of the investigation. Amanda was not under oath, and Sergeant Reihl did not test her story to see how certain and accurate she might have been. Sergeant Reihl’s gentle questioning, which was surely appropriate for his purpose at the time, was not remotely like cross-examination of the alibi witness in a murder trial where the stakes are life and death. There was no cross-examination here; there was not even a mild challenge.
By comparison, when a witness is unavailable, it is clear that even former testimony is admissible under the rules of evidence only if it is offered against a party who had both an opportunity and a similar motive to develop that witness’s testimony by direct, cross-, or redirect examination. Ind. R. Evid. 804(b)(1); Fed.R.Evid. 804(b)(1).
Moreover, if the recorded statement had been admitted, the State would have been unable to test its accuracy through cross-examination. The prosecutor would have *801 been stuck questioning a witness who did not even remember making the statement. See Fed.R.Evid. 804(a)(3) advisory committee note (“the practical effect” of lack of memory “is to put the testimony beyond reach”); 2 McCormick on Evidence § 253 (7th ed.) (a declarant who does not remember the subject matter of her testimony “is simply unavailable by any realistic standard”).
In the adversarial system of Anglo-American law, we put great trust in the power of cross-examination to test both the honesty and the accuracy of testimony. It is virtually an article of faith that cross-examination is the “greatest legal engine ever invented for the discovery of truth.” California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), quoting 5 Wigmore on Evidence § 1367. Without cross-examination to test “any question about the truthfulness” of Amanda’s recorded statement, a powerful assurance of reliability present in Chambers is absent here. Chambers, 410 U.S. at 301, 93 S.Ct. 1038; see also Christian v. Frank, 595 F.3d 1076, 1085 (9th Cir.2010) (reversing grant of habeas relief under Chambers; witness’s “unavailability contrasts sharply with the availability of McDonald in Chambers, which the Supreme Court of the United States stressed greatly enhanced the reliability of the extrajudicial statements in that case”).[7]
D. The Standards of Review and Their Application
To win a federal writ of habeas corpus, Kubsch must show that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). Since the Antiterrorism and Effective Death Penalty Act (AEDPA) amended § 2254 in 1996, though, if a state court has adjudicated a federal claim on the merits, it is not enough for the peti *802 tioner to show a violation of federal law. The petitioner must also show that the state court adjudication of the claim “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” 28 U.S.C. § 2254(d)(1), or “resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d)(2). On Kubsch’s claim under Chambers, our focus is on the state court’s legal analysis under subsection (d)(1), not factual findings under (d)(2).
We agree with the district court that the Indiana Supreme Court adjudicated on the merits Kubsch’s federal constitutional claim under Chambers. Footnote 7 of the state court’s opinion made that much clear, see Kubsch II, 866 N.E.2d at 735 n. 7, so we must evaluate the decision under § 2254(d)(1). Section 2254(d)(1) has two distinct prongs, the narrow “contrary to” prong and the broader “unreasonable application” prong.
1. “Contrary to” Federal Law?
On the first prong, the Indiana Supreme Court’s adjudication of the Chambers claim was not “contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States.” Because no Supreme Court cases “confront ‘the specific question presented by this case,’ the state court’s decision could not be ‘contrary to’ any holding from” that Court. Woods v. Donald, 575 U.S. -, 135 S.Ct. 1372, 1377, 191 L.Ed.2d 464 (2015) (per curiam) (summarily reversing grant of habeas petition), quoting Lopez v. Smith, 574 U.S.-, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per curiam). Under § 2254(d), clearly established federal law includes only “the holdings, as opposed to the dicta,” of Supreme Court decisions. White v. Woodall, 572 U.S. -, 134 S.Ct. 1697, 1702, 188 L.Ed.2d 698 (2014), quoting Howes v. Fields, 565 U.S.-, 132 S.Ct. 1181, 1187, 182 L.Ed.2d 17 (2012).
To note again just the most obvious differences between this case and Chambers, Amanda did not make her statement spontaneously to a close acquaintance, her statement was not against interest, her statement was not corroborated, and she was not subject to cross-examination about the statement. Any of those distinctions would be enough to demonstrate that the Indiana Supreme Court did not confront “facts that are materially indistinguishable from a relevant Supreme Court precedent” and arrive at the opposite result. See Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).
2. “Unreasonable Application” of Federal Law?
The second and broader prong, whether the Indiana Supreme Court’s rejection of Kubsch’s claim under Chambers was, also in the terms of § 2254(d)(1), an “unreasonable application” of clearly established federal law as determined by the Supreme Court of the United States, poses a more difficult question. The state court’s rejection of the Chambers claim was at best incomplete and at worst wrong and unreasonably so. That poses a methodological question on which federal law is not settled. We explore that methodological question below but ultimately conclude that Kubsch’s claim under Chambers fails whether or not we apply deferential review under AEDPA.
The narrow holding of Chambers, based on the combination of the restrictions on impeachment and the exclusion of multiple reliable hearsay confessions by a declarant subject to cross-examination, topped off by *803 the “under the facts and circumstances of this case” qualification, see 410 U.S. at 303, 93 S.Ct. 1038, means that state courts have considerable latitude in interpreting and applying Chambers. See Dunlap v. Hepp, 436 F.3d 739, 744 (7th Cir.2006), quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). Nevertheless, the broader standard that has emerged from Chambers and subsequent cases is that courts cannot impose restrictions on defense evidence that are arbitrary or disproportionate to the purposes they are designed to serve. See Holmes, 547 U.S. at 325, 126 S.Ct. 1727; Rock, 483 U.S. at 56, 107 S.Ct. 2704. The general standard requires a balance of competing interests.
The open texture of that standard and the important factual differences between this case and Chambers — lack of corroboration and lack of opportunity for meaningful cross-examination — mean that the Indiana courts could have rejected Kubsch’s claim under Chambers without unreasonably applying clearly established federal law as determined by the Supreme Court of the United States. See 28 U.S.C. § 2254(d)(1); see generally, e.g., Woods v. Donald, 135 S.Ct. at 1377 (“where the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner’s claims”), quoting White v. Woodall, 572 U.S.-, 134 S.Ct. at 1705, quoting in turn Lockyer v. Andrade, 538 U.S. 63, 76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Only rarely has the Supreme Court “held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence.” Nevada v. Jackson, — U.S.-, 133 S.Ct. 1990, 1991-92, 186 L.Ed.2d 62 (2013) (per curiam) (summarily reversing grant of habeas relief on Chambers claim: “no prior decision of this Court clearly establishes that the exclusion of this evidence violated respondent’s federal constitutional rights”).
Thus, when habeas relief has been granted on a Chambers claim, the facts were a much closer fit to the Supreme Court precedents. In Cudjo v. Ayers, 698 F.3d 752 (9th Cir.2012), for example, the state court had found that the hearsay testimony was “trustworthy and material exculpatory evidence” that should have been admitted under state law but still declined to grant relief under Chambers. See id. at 763. Cudjo thus held that its facts were “materially indistinguishable” from Chambers. Id. at 767, quoting Williams, 529 U.S. at 405, 120 S.Ct. 1495. In discussing the rule that defendants have a constitutional right to present a complete defense, Cudjo also commented that “it would be extremely difficult to say that a state trial court engaged in an ‘unreasonable application’ of this rule when faced with new factual circumstances.” Id.; cf. Cudjo, 698 F.3d at 770-74 (O’Scannlain, J., dissenting).
Accordingly, if the Indiana Supreme Court had announced its rejection of Kubsch’s claim under Chambers without any explanation at all, then we would affirm the denial of habeas relief without further ado. See Harrington v. Richter, 562 U.S. 86, 98, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (“Where a state court’s decision is unaccompanied by an explanation, the habeas petitioner’s burden still must be met by showing there was no reasonable basis for the state court to deny relief.”).
But the Indiana Supreme Court was not silent on the point. It rejected Kubseh’s claim under Chambers in a footnote consisting of one sentence and one citation:
The availability of this testimony [from Monica Buck and Sergeant Reihl to the effect that Amanda had been mistaken] is also the reason why Kubsch’s claim that he was denied his federal constitu *804 tional right to present a defense fails. See Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (protecting defendant’s due process right by recognizing an exception to application of evidence rules where evidence found to be trustworthy).
866 N.E.2d at 735 n. 7.
This terse footnote shows that the state court was aware of the federal constitutional claim and the governing Supreme Court precedent. It cited the page of the Chambers opinion finding that the multiple hearsay confessions by McDonald “bore persuasive assurances of trustworthiness” and should have been admitted because they were so critical to the defense. Keeping in mind the presumption that state courts know and follow the law, see Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam), we find it sufficiently clear that the state court found that Amanda’s statement was not sufficiently reliable to require its admission under Chambers. The state court adjudicated the merits, so its decision requires deference under AED-PA.
The problem is that the only reason actually given by the Indiana Supreme Court — the availability of contradictory testimony from Amanda’s mother and Sergeant Reihl — is the weakest reason that might support that result. It was a good reason to treat as harmless the exclusion of the recorded statement as impeachment, but not as substantive evidence. The mere existence of conflicting or impeaching evidence is not a sufficient basis, or even a reasonable basis, for rejecting the statement as substantive evidence. Conflicting evidence would simply present a fact issue for the jury to weigh after hearing all of that evidence. Perhaps the state court also had in mind the stronger reasons for excluding Amanda’s recorded statement, especially the lack of corroboration and the lack of an opportunity for cross-examination, but if so it did not mention them.
What is the role of the federal courts when a state court offers such a weak reason for a result that could be a reasonable application of federal law? See Brady v. Pfister, 711 F.3d 818, 824-27 (7th Cir.2013) (identifying problem and discussing Supreme Court’s limited guidance). We must review the actual reason deferentially. But if that reason was unreasonable, do we proceed to de novo review? Or do we, instead of doing de novo review, hypothesize reasons the court could have used to see if they are reasonable under AEDPA? See Stitts v. Wilson, 713 F.3d 887, 893 (7th Cir.2013) (raising but not answering this question).[8]
We have interpreted Richter as instructing federal courts to consider what arguments “could have supported” a state court decision when the state court “gave some reasons for an outcome without necessarily displaying all of its reasoning.” Hanson v. Beth, 738 F.3d 158, 163-64 (7th Cir.2013) (affirming denial of relief on Chambers claim based on exclusion of evidence); see also Jardine v. Dittmann, 658 F.3d 772, 777 (7th Cir.2011) (“This court must fill any gaps in the state court’s discussion by asking what theories ‘could have supported’ the state court’s conclusion.”), quoting Richter, 562 U.S. at 102, 131 S.Ct. 770.[9]
*805 The Indiana Supreme Court’s stated rationale for rejecting Kubsch’s claim can be described fairly as incomplete. So long as we have an obligation under § 2254(d)(1) to fill gaps or to complete the state court’s reasoning, the result here is not an unreasonable application of federal constitutional law, and relief must be denied on this claim.[10]
3. De Novo Review
There is room to argue, however, that the state court’s footnote 7 was not just incomplete but wrong, and unreasonably so. And there is room to argue that where the state court has provided a rationale for its decision, the federal courts should focus their attention on the reasons actually given rather than hypothesize a better set of reasons. See Wiggins v. Smith, 539 U.S. 510, 528-29, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (holding state court’s rationale unreasonable without considering other possibilities); Frantz v. Hazey, 533 F.3d 724, 737-38 & n. 15 (9th Cir.2008) (en banc) (confining analysis to reasons actually given by state court, without hypothesizing alternative rationales); Oswald v. Ber *806 trand, 374 F.3d 475, 483 (7th Cir.2004) (“reasonableness of. a decision ordinarily cannot be assessed without considering the quality of the court’s reasoning,” though “ultimate question ... is not whether the state court gets a bad grade for the quality of its analysis but ... whether the decision is an unreasonable application of federal law”). As we explained in Brady v. Pfister, when evaluating a state court’s reasoning in habeas cases, the Supreme Court has focused on the reasons actually given by state courts without engaging in the exercise of trying to construct reasons that could have supported the same result. See 711 F.3d at 826, citing Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), and Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). So AEDPA deference toward state court decisions that reach defensible results for bad or incomplete reasons is not necessarily settled law at this point.
This debate over methodology under § 2254(d) may be ripening for a resolution. In Hittson v. Chatman, 576 U.S.-, 135 S.Ct. 2126, — L.Ed.2d - (2015), .a short opinion concurring in denial of certiorari reminded circuit and district judges of the Court’s decision in Ylst v. Nunnemaker, 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), in which the Court instructed that when federal habeas corpus courts review an unexplained order from a state appellate court, they should “look through” that unexplained order and focus on the last reasoned rejection of the federal claim. See 501 U.S. at 803-04, 111 S.Ct. 2590. In the Hittson concurring opinion, Justice Ginsburg (joined by Justice Kagan) wrote that the Nunnemaker “look through” presumption remains valid after Richter. See 135 S.Ct. at 2127, discussing Richter, 562 U.S. at 99-100, 131 S.Ct. 770, citing Nunnemaker with approval; see also Brumfield v. Cain, 576 U.S.-, 135 S.Ct. 2269, 2276, 192 L.Ed.2d 356 (2015) (applying Nunnemaker “look-through” approach to evaluate and reverse lower state court’s factual findings supporting denial of evidentiary hearing under § 2254(d)(2)); Johnson v. Williams, 568 U.S.-,n. 1, 133 S.Ct. 1088, 1094 n.1, 185 L.Ed.2d 105 (2013) (citing Nunnemaker with approval); Hawthorne v. Schneiderman, 695 F.3d 192, 199-201 (2d Cir.2012) (Calabresi, J., concurring) (arguing that practice under Richter of inventing hypothetical reasons for state court decision promotes neither comity nor efficiency).
Justice Ginsburg’s opinion in Hittson argued that the Richter practice of hypothesizing rationales for state court rejections of federal claims should be limited to cases where no state court explained the rejection, and that where the state court’s real reasons can be ascertained, the inquiry under § 2254(d)(1) “can and should be based on the actual ‘arguments or theories [that] supported ... the state court’s decision.” 135 S.Ct. at 2128-29, quoting Richter, 562 U.S. at 102, 131 S.Ct. 770. This statement may imply that federal courts should shift to de novo review as soon as they find that the reason actually given by a state court was unreasonable, without trying to hypothesize alternative rationales.
Because of this uncertainty in whether we may “complete” the state court’s reasoning on this Chambers claim, it is prudent for us also to consider Kubsch’s Chambers claim under a de novo standard of review. Even if we conclude that the state court’s footnote 7 was an unreasonable application of Chambers to reject Kubsch’s claim, that would not necessarily entitle Kubsch to habeas relief. He would still need to show on the merits that his constitutional rights were in fact violated, as § 2254(a) requires for a grant of actual relief. See Brady, 711 F.3d at 827 (applying de novo review in the alternative); *807 Mosley v. Atchison, 689 F.3d 838, 852-54 (7th Cir.2012) (where state court decision was unreasonable under § 2254(d)(1), remanding to district court to determine merits de novo under § 2254(a)).
If de novo review applies, the issue is closer than under § 2254(d)(1), but we conclude that the exclusion of Amanda’s recorded statement as substantive evidence did not violate Kubsch’s federal constitutional right to put on a defense. As explained above, Amanda’s statement is not corroborated on the critical facts by any other evidence, and she was never subjected to meaningful cross-examination. Even during the recorded interview itself, she was never pushed by the interviewer about the critical day and time, nor about the possibility that her memory had confused events of two different days.
Those facts distinguish this case from Chambers, which was, on its face, a very narrow opinion. Recall that the holding in Chambers depended on the combination of the limits the “voucher rule” placed on cross-examination and the exclusion of the three hearsay confessions, which were directly corroborated in many ways and had other indications of reliability. 410 U.S. at 302-03, 93 S.Ct. 1038.
Even applying the more general principles from the Chambers line of cases, we are not persuaded that the Constitution requires the general rule against hearsay to give way to Kubsch’s interest in offering as substantive evidence a recorded, exculpatory interview of a witness who was in effect not available for cross-examination and whose account does not have significant corroboration on the critical points.
A vast literature attempts to explain the complex edifice of American hearsay law. A helpful and authoritative explanation came from the Advisory Committee on the Federal Rules of Evidence, published as an introductory note to the hearsay article in the Rules. A helpful and more detailed survey is available in 30 Wright & Graham, Federal Practice and Procedure §§ 6321-6333 (1997). As noted above, issues of reliability and trustworthiness are front and center in deciding whether to relax the general prohibition on hearsay. Our legal system relies primarily on in-person testimony subject to meaningful cross-examination, the “greatest engine ever invented for the discovery of truth,” to test evidence. See California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), quoting Wigmore on Evidence § 1367; see also Rice v. McCann, 339 F.3d 546, 551 (7th Cir.2003) (Posner, J., dissenting) (“The principal justification for the hearsay rule is that most hearsay statements, being made out of court, are not subject to cross-examination.”).
Lest this reasoning seem like reflexive devotion at the altar of cross-examination, we draw help from Professors Wright and Graham to explain why this is so important. Their treatise identifies four dangers of hearsay: (1) defects in the declarant’s perception; (2) defects in the declarant’s memory; (3) defects in narration by both the declarant and the witness; and (4) the declarant’s lack of sincerity or honesty. 30 Wright & Graham, Federal Practice and Procedure §§ 6324. Without an opportunity for cross-examination before the trier of fact, it can be difficult to test hearsay for these defects. Most hearsay exceptions have evolved from situations providing circumstantial guaranties of trustworthiness that seem to be sufficient substitutes for that direct scrutiny in a trial. See id., § 6333.
In the case of Amanda’s recorded statement, the third and fourth dangers seem minimal. The recording eliminates the risk that Amanda’s statement would be *808 relayed inaccurately, and she had.no apparent difficulty describing what she remembered. The nine-year-old Amanda in the interview was also a disinterested witness, old enough to know she should tell the truth and with no apparent reason to deceive the police intentionally.
The first two dangers remain, however, with no meaningful protections under these circumstances. There simply is no way to test directly, by cross-examination or otherwise, the accuracy of the nine-year-old Amanda’s memories of the past several days, to test the possibility that she was misremembering what and whom she had seen where and on which days. The accuracy of her memory was not tested or even challenged during the recorded interview itself, nor was the importance of being accurate about the time and date brought to her attention in the interview. Nor is there other evidence corroborating the recorded account as to the critical date and time.
In light of these considerations, it was not arbitrary or disproportionate to enforce the rules of evidence to exclude Amanda’s recorded statement as substantive evidence. Accepting Kubsch’s theory, on the other hand, would upset a good deal of the rules of evidence developed over generations to find the right balance so that trials can be decided fairly and on the basis of reliable evidence. As the prosecutor said in the trial court here, we could just show juries a series of videotaped, ex parte witness interviews, but that is not how we do trials in our legal system. There is no indication in the narrow Chambers opinion that such a sweeping result was intended then. Nor do the Supreme Court’s later cases in the Chambers line endorse such a sweeping result.
Kubsch argues that he seeks only a narrow exception, comparable to the narrow •decision in Chambers. He tries to limit the rule he seeks to hearsay witness statements that are recorded (ensuring accuracy of transmission), about recent events (fresh in the witness’s memory), detailed, and from disinterested witnesses, at least where the evidence would be critical to the defense. With inexpensive recording technology widely available, however, we can expect that such evidence will often be available. Kubsch’s theory would thus expand dramatically the availability, at least to the accused, of hearsay evidence that cannot be subjected to meaningful cross-examination. Considering the Chambers issue de novo, we believe Kubsch is seeking a significant and unwarranted expansion of existing doctrine, unmoored from the critical assurances that corroboration and cross-examination provided in Chambers itself.
We do not doubt that hearsay rules sometimes exclude evidence that is in fact accurate. They also exclude a good deal of evidence that is unreliable. Those rules have evolved based on experience to prevent the use of inaccurate and unreliable hearsay in trials. We also must recognize the risk of error in our human and fallible criminal justice system, especially in a death-penalty case. That is why Chambers was decided as it was, though the sentence there had been life in prison rather than death. In that exceptional case, the familiar rules of evidence worked arbitrarily to exclude reliable evidence of innocence.
The risk of serious error is not enough, however, to open the gates to all hearsay of this type, especially where it is not . corroborated as it was in Chambers and where it is not subject to meaningful cross-examination. The unavoidable risk of error may offer a strong argument against the death penalty as a matter of policy, but that is not a choice available to us. See, e.g., Glossip v. Gross, 576 U.S.-, 135 *809 S.Ct. 2726, 192 L.Ed.2d 761 (2015) (all opinions).
Accordingly, we affirm the district court’s denial of relief on the Chambers claim. The state court’s result on this question was not an unreasonable application of federal law. And even if the state court’s incomplete and unsatisfactory rationale-had amounted to an unreasonable application of federal law, Kubsch’s claim does not prevail on the merits under de novo review.
III. Ineffective Assistance of Counsel for Amanda’s Statement
Kubsch approaches Amanda’s statement from a different angle by arguing that even if his stand-alone claim under Chambers fails, his trial counsel provided ineffective assistance by failing to do a better job in trying to have the recording admitted into evidence. The Indiana Supreme Court rejected this claim on appeal from the denial of post-conviction relief, finding that it was barred by the doctrine of res judicata. Kubsch III, 934 N.E.2d at 1143 n. 2.
Under the controlling standard from Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Kubsch must show (1) that his trial lawyers’ performance was deficient, meaning that it fell below an objective standard of reasonableness in light of prevailing professional norms, id. at 690, 104 S.Ct. 2052, and (2) that the deficient performance prejudiced his case, meaning that there is a reasonable probability that, but for the lawyers’ unprofessional errors, the result of the proceeding would have been different, id. at 694, 104 S.Ct. 2052. Kubsch has not made either showing.
The Indiana Supreme Court’s res judicata holding was reasonable as far as it went. To the extent that Kubsch was arguing that the recorded interview should have been admitted and would have made a difference in the trial, the state court had already decided those questions against Kubsch in the direct appeal. Kubsch II, 866 N.E.2d at 734-35. A post-conviction petitioner cannot avoid claim preclusion by merely repackaging an earlier claim. E.g., Reed v. State, 856 N.E.2d 1189, 1194 (Ind.2006).
Kubsch’s post-conviction argument on this score was not, however, merely a repackaging of the claim that the recording should have been admitted as evidence. He also argued and tried to offer evidence that if his trial lawyers had taken some additional steps, the interview would have been admitted into evidence and was reasonably likely to change the jury’s verdict. The state court’s res judicata holding did not engage that evidence and argument.
Even if we review this claim de novo, however, Kubsch has not shown that his trial lawyers were constitutionally deficient. It is not as though the trial lawyers overlooked the issue. Several months before the second trial, Amanda testified in a deposition where her mother was also present. See Tr. 2983-84; 3013. We do not have that transcript, but the lawyers obviously did. And they had the opportunity to talk to Amanda’s mother Monica as well. The lawyers made clear in their post-conviction testimony that they had no real interest in anything Amanda or Monica might say from the witness stand; they wanted the recording in evidence. PCR Tr. 106; Tr. 3028.
The trial transcript shows they worked hard to convince the trial court to admit the recording. See Tr. 2982-90; 3010-35; 3112-23. They were not successful because they could not lay a sufficient foundation to admit the recording under Rule 803(5) as recorded recollection, and as ex *810 plained above, the inability to use it to impeach the non-inculpatory “probably didn’t see him” portion of Amanda’s brief trial testimony was harmless. To change this result, Kubsch needed to come forward in the post-conviction proceedings with evidence or new legal arguments that were available to his trial lawyers, clearly should have been presented, and were reasonably likely to turn the tide. As the district court explained, he failed to do so. Kubsch, 2013 WL 6229136, at *39-40.
Kubsch criticizes his trial lawyers for having failed to correct or challenge what he says is misinformation about the reports that Amanda and her mother had been mistaken in their interview with Sergeant Reihl, and argues that they should have investigated in more detail her mother’s statement of March 2000 asserting that they had mixed up Thursday and Friday in the videotaped interview. Kubsch has not shown what that further investigation would have uncovered, let alone how it would have helped him.
Contrary to the dissent’s assertion, the trial judge did not keep out Amanda’s videotaped statement because he thought it would have been easily impeached. When the prosecution and defense were debating the admissibility of the statement before the trial court, the prosecutor argued against admitting the statement “full well knowing that the little girl was mistaken” and that her mother would testify to that effect. Tr. 3015-16. The trial judge immediately responded: “The jury judges that. The jury judges if the girl is right or the mother is right.” Tr. 3016. The judge kept the recorded hearsay statement out as substantive evidence because it did not qualify as a recorded recollection, and he kept it out as impeachment because Amanda had said nothing worth impeaching.
In this appeal, the specific criticisms of counsel, by both Kubsch and our dissenting colleague, are based on speculation rather than the sort of evidence needed to support the claim. Kubsch developed the factual record for this claim of ineffective assistance of counsel in a three-day evidentiary hearing in a state trial court in 2008. That is the record before us on this question. See Cullen v. Pinholster, 563 U.S. 170, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011); 28 U.S.C. § 2254(d)(2) & (e).
Kubsch’s new lawyers called both of his trial lawyers as witnesses in the post-conviction hearing. The transcript shows that they were asked a few questions about Amanda’s recorded interview and her mother’s statement from March 2000, but there simply was no inquiry into the lawyers’ ■ supposed “failures” on this score. Nor was there any effort to show what would have happened if the trial lawyers had done what Kubsch’s new lawyers argue should have been done. They did not call Amanda or Monica or anyone else to fill in the factual gaps. That proceeding and that hearing were Kubsch’s opportunity to make a factual record showing deficient performance that was harmful to his case. He simply did not make that showing.
Our dissenting colleague finds the trial lawyers deficient in some additional ways: for not having asked Amanda if her statements in the interview were accurate, if she was actually the girl shown in the video, and if she would have told the police the truth; and for having failed to challenge Lonnie Buck’s account of the correction on the date, to call Monica to corroborate Amanda’s answers in the interview, to track down bank records for Monica’s deposit of her paycheck, and to pursue corroboration about the school field trip. Post at 828-29. But again, there is no factual record to support such speculation *811 about what these efforts would have shown. Kubsch’s post-conviction lawyers did not question his trial lawyers on the witness stand about these matters, nor did they track down and offer the evidence that the dissent says might have helped.
This is not to suggest that Kubsch’s post-conviction lawyers were themselves ' anything- other than highly competent and diligent. Kubsch is now being represented by at least his sixth team of capable and experienced capital defense lawyers. See Ind. R.Crim. P. 24 (qualifications and compensation for trial and appellate counsel in capital cases). The post-conviction lawyers (the fifth team) no doubt investigated this claim as thoroughly as possible. But when the time came to offer actual evidence about the results of the investigation, they simply did not have evidence that the dissent says should have been “easily within reach.” We cannot grant relief by filling in the gaps with our own speculation that further investigation would have been sufficiently helpful to Kubsch’s defense.
IV. Waiver of Counsel at the Penalty Phase
We turn now to Kubsch’s third principal claim on appeal. At the penalty phase of the trial, Kubsch waived his right to counsel and represented himself. He chose not to present any mitigating evidence. He did make a statement to the jury in which he said the murders were a “horrific nightmare” for which the death penalty would be appropriate, but he also continued to assert his innocence. On direct appeal and federal habeas review — though not in the intervening state post-conviction proceeding — he has argued that his waiver of counsel was not sufficiently knowing and intelligent because he was not “made aware of the dangers and disadvantages of self-representation.” See Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
The Indiana Supreme Court considered and rejected the claim. Kubsch II, 866 N.E.2d at 735-38. That decision was not an unreasonable application of federal law under the circumstances of this' case. See 28 U.S.C. § 2254(d)(1). Kubsch made clear that he was waiving counsel because he did not want to present evidence at the sentencing phase of the trial. That decision simplified substantially the challenge of representing himself, so the trial judge’s colloquy was sufficient under the circumstances. Neither Faretta nor any other Supreme Court decision required the judge to discourage Kubsch from making his decision to waive counsel.
A. The Constitutional Standard
We first address the constitutional standard before turning to its application in this case. Faretta established that “a defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so.” 422 U.S. at 807, 95 S.Ct. 2525. Though “he may conduct his own defense ultimately to his own detriment, his choice must be honored out of ‘that respect for the individual which is the lifeblood of the law.’-” Id. at 834, 95 S.Ct. 2525, quoting Illinois v. Allen, 397 U.S. 337, 350-351, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J.,’ concurring). Faretta also cautioned that when “an accused manages his own defense” he forgoes “many of the traditional benefits associated with the right to counsel.” Id. at 835, 95 S.Ct. 2525. Respect for the value of these “relinquished benefits” is why “the accused must knowingly and intelligently” waive the fight to counsel. Id. (internal quotation marks omitted), citing Johnson v. Zerbst, 304 U.S. 458, 464-65, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).
*812 “The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.” Johnson, 304 U.S. at 464, 58 S.Ct. 1019. Two other relevant “case-specific factors” are “the complex or easily-grasped nature of the charge” and “the stage of the proceeding.” Iowa v. Tovar, 541 U.S. 77, 88, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004). To determine whether a defendant has knowingly and intelligently waived the right to counsel, “a judge must investigate as long and as thoroughly as the circumstances of the case before him demand.” Von Moltke v. Gillies, 332 U.S. 708, 723-24, 68 S.Ct. 316, 92 L.Ed. 309 (1948).
Both the Indiana Supreme Court and this circuit consider four factors in the waiver inquiry: “(1) the extent of the court’s inquiry into the defendant’s decision, (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant’s decision to proceed pro se. ” Kubsch II, 866 N.E.2d at 736, quoting Poynter v. State, 749 N.E.2d 1122, 1127-28 (Ind.2001), quoting in turn United States v. Hoskins, 243 F.3d 407, 410 (7th Cir.2001).
The constitutional standard is flexible, and its application must be adapted to the case. The Supreme Court has not prescribed a list of admonitions that must be given to all defendants who want to waive counsel. See Tovar, 541 U.S. at 92, 124 S.Ct. 1379 (reversing state court’s finding that waiver was invalid: “In prescribing scripted admonitions and holding them necessary in every guilty plea instance ... the Iowa high court overlooked our observations that the information a defendant must have to waive counsel intelligently will depend, in each case, upon the particular facts and circumstances surrounding that case.”) (citation and internal quotation marks omitted); see also United States v. Moya-Gomez, 860 F.2d 706, 733 (7th Cir. 1988) (“Although we stress the need for a thorough and formal inquiry as a matter of prudence and as a means of deterring unfounded claims on appeal, we shall not reverse the district court where the record as a whole demonstrates that the defendant knowingly and intelligently waived his right to counsel.”); United States v. Egwaoje, 335 F.3d 579, 585 (7th Cir.2003) (reaffirming this holding of Moya-Gomez). The extent and formality of the waiver colloquy are relevant, but it is the waiver itself, not the waiver colloquy, that is the proper focus of the inquiry.
This constitutional standard does not impose a separate duty to discourage a defendant from representing himself. If a defendant is not already “aware of the dangers and disadvantages of self-representation,” then the trial court must educate him so that he is aware of those risks when he decides. Faretta, 422 U.S. at 835, 95 S.Ct. 2525. When a defendant wants to take on the challenges of representing himself at trial, including dealing with jury selection, presentation of evidence, and jury instructions, the judge may and usually will try to discourage that option as a means of forcing the defendant to think carefully about unfamiliar risks.
We find no Supreme Court decision, however, requiring a judge to discourage self-representation in all circumstances. If a judge believes, as the trial judge did here, that the defendant is making a knowing and intelligent waiver, then she would commit constitutional error by • discouraging that decision too strongly. Faretta clearly established the constitu *813 tional right to self-representation. “That right is not honored if judges must depict self-representation in such unremittingly scary terms that any reasonable person would refuse.” United States v. Oreye, 268 F.3d 669, 672 (7th Cir.2001), quoting United States v. Hill, 252 F.3d 919, 928-29 (7th Cir.2001).
When a defendant raises the possibility of representing himself, the trial court is placed “between the Scylla of trammeling the defendant’s constitutional right to present his own defense and the Charybdis of shirking its ‘constitutional duty to ensure that the defendant only represents himself with full awareness that the exercise of that right is fraught with dangers.’ ” United States v. Sandles, 23 F.3d 1121, 1127 (7th Cir.1994) (citation omitted), quoting Moya-Gomez, 860 F.2d at 732. Appellate courts have tried to keep the permissible middle ground between these opposing errors fairly broad, allowing trial judges reasonable leeway to adapt the inquiry to the circumstances of the case without requiring a script or checklist. Trial judges seeking this middle way are not constitutionally bound to discourage every defendant from representing himself no matter the facts and circumstances of the case.
B. Kubsch’s Waiver of Counsel
With this constitutional standard in mind, we turn to the facts of Kubsch’s waiver of his right to counsel for the sentencing phase of his trial. The attorneys who represented Kubsch at the guilt phase of his trial were a veteran team who qualified as a capital defense team under Indiana Rule of Criminal Procedure 24, which sets minimum qualifications for lead and co-counsel in capital cases. During the sentencing phase they, served as Kubsch’s legal advisors by court appointment. Kubsch could ask them for advice, but they could no longer speak for him in court.
Kubsch represented himself at the sentencing phase of his trial because he did not want to present mitigating evidence. Kubsch was advised by the court and counsel that if his counsel had represented him in the sentencing phase, his counsel would have made the final decision about which witnesses to call. His attorneys planned to offer mitigating evidence, and they named the witnesses they would have called and provided Kubsch a written summary of that evidence. The court asked Kubsch whether he wanted any of those witnesses to be called. Kubsch confirmed that he did not.
The court then told Kubsch what to expect in the sentencing phase of the trial if, as both sides planned, he and the State presented no new evidence. Each side would address the jury, and the court would instruct the jury on the applicable sentencing law, including relevant aggravating and mitigating factors. The court told Kubsch that as his own attorney he would have the right to address the jury directly.
Finally, the court considered the standard advice and warnings given to defendants deciding whether to represent themselves. The court noted that nearly all the advice and warnings concern the challenges of trial, such as selecting jurors and presenting evidence, which can be difficult without legal training and experience. The court pointed out that if the sentencing phase did not include additional evidence, the most difficult obstacles for a pro se defendant would not be present. The court then reiterated that Kubsch had the right to make a statement to the jury and allowed his attorneys to withdraw their appearances.
Kubsch now argues that his waiver was not knowing and intelligent because the *814 court’s colloquy was insufficient and because the judge did not attempt to discourage his choice. The Indiana Supreme Court considered these arguments in detail and in light of the circumstances of this case, particularly Kubsch’s reasons for wanting to represent himself and the stage of the proceeding, where he would only make a statement to the jury about the appropriate penalty. Kubsch II, 866 N.E.2d at 735-38.
The Indiana Supreme Court noted that Kubsch himself “eliminated the need” for almost all of the standard advisements given to defendants deciding whether to represent themselves by confirming that he did not wish to present evidence at the sentencing phase of his trial. Id. at 736. Accordingly, the waiver colloquy was “sufficient to apprise the defendant of the dangers he is facing in the particular matter at hand.” See id. All that remained in the trial, as a practical matter, was a closing argument on whether the death penalty should be imposed.
The stakes were as high as they come in a trial, but they were highest for the man who wanted to speak for himself. The Faretta right of self-representation is founded upon respect for the autonomy of the defendant:
The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of “that respect for the individual which is the lifeblood of the law.”
422 U.S. at 834, 95 S.Ct. 2525.
The state court also noted the trial judge’s observation about Kubsch’s competence at the end of this three-week trial:
I want to state for the record, in this case, that the Court observed Mr. Kubsch throughout trial, that during trial he pretty much constantly was able to confer with his attorneys, was able to confer with his factual investigator that interviewed witnesses in this case, that he testified in this case, that the Court found his testimony to be coherent and relevant to the facts of this case, and that the Court has no reason to doubt Mr. Kubsch’s competency to represent himself in this matter.
Tr. 3339-40, quoted in Kubsch II, 866 N.E.2d at 737. The state court quoted this observation to help show that Kubsch was capable of understanding, and did in fact understand, the decision he was making. It also pointed out that “at the time he chose to represent himself, Kubsch had already participated in two murder trials and one penalty phase.” Kubsch II, 866 N.E.2d at 738. “In other words, he obvi-' ously knew from his own experience of his right to call witnesses, present other evidence, and propose mitigating factors.” Id.
Finally, the Indiana Supreme Court viewed Kubsch’s decision to waive counsel as knowing because it was strategic, intended to prevent his counsel from calling witnesses in the penalty phase of the trial. Id., citing United States v. Todd, 424 F.3d 525, 533 (7th Cir.2005). “Choosing to waive counsel because one does not agree with trial strategy is perhaps not the best choice, or even a good choice, but it can be a rational choice.” 866 N.E.2d at 738.
Citing John H. Blume, Killing the Willing: “Volunteers, ” Suicide and Competency, 103 Mich. L.Rev. 939 (2005), Kubsch argues now that his decision was not so much strategic as suicidal, calculated to *815 bring about his own execution and indicating “a pre-existing mental illness.” That is indeed one way to understand Kubsch’s behavior. Another way to understand Kubsch’s behavior, however, is to take at face value his words at the sentencing phase of both trials. At both he articulated a principled opposition to arguing that any mitigating evidence could outweigh the aggravating circumstances of the crimes a jury had convicted him of committing. Faretta was decided precisely to protect such principled decisions. Kubsch now apparently regrets his decision to proceed pro se. That does not mean his decision' was any less principled when he made it or that it was the product of mental illness.
His strategy can also be understood in . quite sensible terms. Rather than begging for mercy from the jury that had just convicted him of three brutal murders without any apparent mitigating circumstances, Kubsch told the jury, “I wouldn’t even dare try to insult your intelligence by wasting your time by presenting mitigation.” Tr. 3372. He instead asserted several times that he is innocent. His approach can be understood as a reminder that the jurors should consider the possibility that they might have made a mistake, so that residual doubt should weigh against the death penalty. That approach is entirely consistent with his defense at trial, even though neither was successful. The state courts did not act unreasonably in viewing the waiver as strategic and knowing. See United States v. Davis, 285 F.3d 378, 384-85 (5th Cir.2002) (defendant chose to represent himself at sentencing phase of capital trial for similar strategic reason; appellate court issued writ of mandamus barring district court’s appointment of independent counsel to present mitigating evidence over defendant’s objection).
Kubsch argues most strenuously that the trial judge had a duty under “the spirit of Faretta ” to discourage him from waiving his right to counsel. That is not what Faretta said or means. Faretta held that a defendant has a constitutional right to waive counsel as long as the waiver is knowing, voluntary, and intelligent. The core of Faretta is respect for the defendant’s autonomy even if he makes a foolish decision. 422 U.S. at 834, 95 S.Ct. 2525; see also Davis, 285 F.3d at 384. There is no requirement to discourage the defendant. As noted, we have warned that excessive discouragement, even for a defendant who wishes to handle the entire case, can violate Faretta. See Hill, 252 F.3d at 929 (“A defendant bullied or frightened into acquiescing in a lawyer that he would rather do without would be in a much better position to say that the choice was not made knowingly or intelligently.”).
The basic problem with Kubsch’s argument is that most of the specific advice usually given to defendants was unnecessary for him. He planned to present no mitigating evidence and planned only to make a brief statement to the jury. Cf. Federal Judicial Center, Benchbook for U.S. District Court Judges § 1.02 (6th ed.) (warnings focus on procedural and evidentiary challenges before and during trial).
Kubsch responds that this view “shifts responsibility from the trial court to the defendant, making the defendant responsible to inform the court how he wished to proceed, to determine the level of warning the court must give him.” The Indiana Supreme Court did not make that mistake. Kubsch’s counsel and then Kubsch himself explained his plans to the trial judge. The judge was not required to question Kubsch’s strategy, and he did not require Kubsch to provide information. Kubsch volunteered it. The trial judge adapted his approach to the waiver inquiry accordingly.
*816 In a variation on this argument, Kubsch also argues that the waiver colloquy was actually misleading. At one point, the trial judge said, “In a way I’m saying, your representation would not be as complicated as if you were handling the whole trial by yourself. Do you understand that?” Tr. 3342. Taken in context, this statement was not misleading at all. It was true. Making a statement to the jury was far simpler for Kubsch than representing himself in the guilt phase of his trial would have been. See Tovar, 541 U.S. at 88 (explaining that the “information a defendant must possess in order to make an intelligent” waiver depends in part on “the stage of the proceeding”).
In sum, the federal Constitution required the trial judge to determine whether Kubsch’s waiver of counsel for the last phase of his trial was knowing, voluntary, and intelligent. The Indiana Supreme Court did not apply that clearly established federal law unreasonably by holding that Kubsch’s waiver was valid in light of “the particular facts and circumstances surrounding that ease, including the background, experience, and conduct of the accused,” see Johnson, 304 U.S. at 464, 58 S.Ct. 1019, and the stage of the proceeding, see United States v. Hoskins, 243 F.3d at 410.
Accordingly, we AFFIRM the district court’s judgment denying relief.

. Nichols’ wife, Gina DiDonato, confirmed his account of the telephone call and in response to a juror’s question made clear that Kubsch told them that Beth was dead.

. By the time Kubsch testified at trial, of course, he knew about the telephone records and other evidence that contradicted in several key respects the story he had first told the police in his interview the night of the murders.

. The recording would also not be admissible under Federal Rule of Evidence 803(5), which is substantially identical to its Indiana counterpart and has the same requirement that the declarant endorse the accuracy of the prior recording. See, e.g., United States v. Green, 258 F.3d 683, 689 (7th Cir.2001); United States v. Schoenborn, 4 F.3d 1424, 1427-28 (7th Cir.1993). In fact, neither Kubseh nor our dissenting colleague has identified any federal or state decision indicating that the recording of Amanda's interview would have been admissible under the law of any American jurisdiction. See also, e.g., State v. Perry, 147 Ohio App.3d 164, 768 N.E.2d 1259, 1264-65 (2002) (under identical recorded recollection rule, affirming exclusion of video recording of interview with eight-year-old child who, when testifying at trial two years later, did not remember the interview and did not testify that the recording correctly reflected her knowledge of events at the time it was made).

. The Supreme Court’s account of the facts was deliberately terse. It made no mention at all, for example, of the case’s racial dimensions and the civil rights boycott at the heart of the events in a small town in rural Mississippi in 1969. For a more complete account that emphasizes the gap between local realities and formal legal recognition of civil rights, see Emily Prifogle, Law and Local Activism: Uncovering the Civil Rights History of Chambers v. Mississippi, 101 Cal. L.Rev. 445 (2013).

. Kubsch points out that Rick Milewski was driving not his own black truck but a white truck that he had borrowed from his brother. In her statement, Amanda said that Rick was driving a white truck that day. But as Kubsch also acknowledges, Rick had borrowed that truck from his brother a few weeks before the murders. The color of the truck does not corroborate Amanda’s statement about which afternoon she saw Rick and Aaron at home.

. Our dissenting colleague contends that this case is like Chambers because Kubsch, like Chambers, tried to show that someone else committed the murders — Kubsch's long-time friend Brad Hardy. Post at 832-33. We disagree. In Chambers, the evidence against McDonald would have exonerated Chambers; there was no evidence that they acted together. Readers of the dissent might think there was a similar either-or dynamic at work here. There was not. The prosecution argued that Hardy had either helped Kubsch or had been set up by Kubsch as his fall guy.
Hardy testified in both of Kubsch’s trials, though at the time of the first trial he was charged with conspiring with Kubsch to commit the murders. (The charges were later dismissed.) Kubsch called Hardy on the day of the murders at 9:11 a.m. Hardy and his mother, Constance Hardy, each testified that Constance drove Hardy to Kubsch’s workplace two hours later when Kubsch began his early lunch break. Hardy testified that Kubsch then drove him to a parking lot near the Kubsch house and asked him to sneak up to the house from the rear to see if Beth was ■ home. Hardy also testified that the day after the murders Kubsch asked him to lie about their activities the day before. (Kubsch denied Hardy’s account.)
Phone records showed that Kubsch again called Brad Hardy on the day of the murders at 4:44 p.m. It is undisputed that Kubsch arrived at Brad and Constance Hardy’s house 45 minutes later and stayed for an hour before going to his home. The defense argued that this visit was for the purpose of "invit[ing] [Brad] out to dinner that night.” Tr. at 3301. It is curious that, on the evening of his wife’s birthday — when Kubsch claims not to have seen Beth all day and after Beth’s mother called him to say that she was concerned about not hearing from Beth — Kubsch would take an hour-long detour to Hardy's house just to extend a dinner invitation, especially when he had spoken to Hardy just 45 minutes earlier. In light of this curious detour, the fact that Beth's credit cards were later found in the woods near Hardy’s house could be viewed as implicating Kubsch as much as Hardy. In short, the “significant evidence pointing to Hardy” did not necessarily tend to exonerate Kubsch, as the dissent suggests and in contrast to the evidence related to Gable McDonald in Chambers.

. In Stitts we considered whether to "look through" a state supreme court's ruling to a lower state court’s decision. In this case, we cannot "look through” the Indiana Supreme Court’s ruling on the Chambers claim. The claim was not presented to the trial court, and capital appeals in Indiana go directly to the Indiana Supreme Court.

. Makiel v. Butler, 782 F.3d 882, 905-06 (7th Cir.2015), presented a related but distinct is *805 sue. In Makiel, the state court gave two reasons why the exclusion of certain evidence did not violate the petitioner’s right to present a complete defense. One reason was flawed but the second was sound. The sound second reason was enough to call for AEDPA deference. Here, by contrast, the state court gave only one reason to reject the constitutional claim, and that reason is flawed.

. Most circuits endorse this approach that allows and even requires federal courts to complete or fill the gaps in state courts' reasoning in support of results that are not unreasonable in light of Supreme Court precedent. See Foxworth v. St. Amand, 570 F.3d 414, 429 (1st Cir.2009) (“on habeas review, the ultimate inquiry is not the degree to which the state court’s decision is or is not smoothly reasoned; the ultimate inquiry is whether the outcome is reasonable”); Rashad v. Walsh, 300 F.3d 27, 45 (1st Cir.2002) (where federal courts were troubled by gaps in state court’s rationale: "It is not our function, however, to grade a state court opinion as if it were a law school examination.”); Cruz v. Miller, 255 F.3d 77, 86 (2d Cir.2001) ("deficient reasoning will not preclude AED-PA deference”); Collins v. Sec’y of Pennsylvania Dept of Corr., 742 F.3d 528, 548 (3d Cir.2014) (while state court adjudication of Strickland claim consisted of "admittedly cursory statements, AEDPA requires that we determine what arguments or theories supported ... or could have supported, the state court’s decision”) (citation arid internal quotation marks omitted); Robinson v. Polk, 438 F.3d 350, 358 (4th Cir.2006) ("In assessing the reasonableness of the state court’s application of federal law, therefore, the federal courts are to review the result that the state court reached, not whether its decision was well reasoned.”) (brackets, citations, and internal quotation marks omitted); Higgins v. Cain, 720 F.3d 255, 261 (5th Cir.2013) (“In considering whether the state court’s decision constituted an unreasonable application of clearly established federal law, ‘a federal habeas court is authorized by Section 2254(d) to review only a state court’s "decision,” and not the written opinion explaining that decision.’ ”), quoting Neal v. Puckett, 286 F.3d 230, 246 (5th Cir.2002) (en banc); Holder v. Palmer, 588 F.3d 328, 341 (6th Cir.2009) (“The law requires such deference to be given even in cases, such as this one, where the state court’s reasoning is flawed or abbreviated.”); Williams v. Roper, 695 F.3d 825, 831 (8th Cir.2012) (“In reviewing whether the state court's decision involved an unreasonable application of clearly established federal law, we examine the ultimate legal conclusion reached by the court, not merely the statement of reasons explaining the state court's decision.”) (citation omitted); Williams v. Trammell, 782 F.3d 1184, 1199-1200 (10th Cir.2015) ("uncertainty” regarding rationale for a sparse state court decision “does not change our deference;” federal court still must identify theories that could have supported the decision); Lee v. Comm’r, Alabama Dep’t of Corr., 726 F.3d 1172, 1210-14 (11th Cir.2013) (applying AEDPA deference to incomplete state court opinion; state court need not "show its work” by mentioning all circumstances relevant to Batson claim); but see Frantz v. Hazey, 533 F.3d 724, 737-38 & n. 15 (9th Cir.2008) (en banc) (confining evaluation of "unreasonable application” prong to actual reasons given).