In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3454

FEDELL CAFFEY,

*Petitioner-Appellant*,

*v.*

KIM BUTLER, Warden,

*Respondent-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 5458 — **Matthew F. Kennelly**, *Judge*.

ARGUED OCTOBER 29, 2014 — DECIDED SEPTEMBER 22, 2015

Before RIPPLE, KANNE, and SYKES, *Circuit Judges*.

KANNE, *Circuit Judge*. Fedell Caffey is serving a life sentence in Illinois on triple-murder and aggravated kidnapping convictions. Caffey maintains he is innocent. He petitioned the district court for a writ of habeas corpus, claiming that his trial and post-conviction proceedings in state court were marred by numerous violations of his constitutional rights. The district court held an evidentiary hearing, thoroughly reviewed the record, and issued a detailed opinion

denying Caffey's petition. We affirm the district court's denial of Caffey's habeas corpus petition.

## I. BACKGROUND

On the night of November 16, 1995, Debra Evans was fatally shot and stabbed in her apartment in Addison, Illinois. She was nine months pregnant. The assailants cut open her womb and removed the unborn baby inside, whom Debra had named Elijah. Debra also had three older children— Samantha (age 10), Joshua (age 7), and Jordan (age 2). Samantha was killed in the apartment along with her mother. Elijah and Joshua were taken from the scene. Two-year-old Jordan was left behind, alive, with his dead mother and sister. The next day, police found Joshua's lifeless body in an alley in Maywood, Illinois.

Police arrested Debra's former boyfriend Laverne Ward, who was the father of Jordan and Elijah—the only children who survived. Police also arrested Ward's cousin Jacqueline Annette Williams and her live-in boyfriend Fedell Caffey, the defendant-petitioner in this case. A grand jury indicted Ward, Williams, and Caffey on multiple counts of first-degree murder and aggravated kidnapping. Each defendant was tried separately.

In 1999, a jury found Caffey guilty of the first-degree murder of Debra, Samantha, and Joshua, as well as the aggravated kidnapping of Joshua. Caffey received a sentence of death on the murder convictions and a consecutive thirty-year prison term on the aggravated kidnapping conviction. In 2003, Illinois Governor George Ryan commuted Caffey's death sentence to life without parole.

Caffey claims in this appeal that his trial was fundamentally unfair because certain evidence was excluded or otherwise not presented to the jury. In order to assess his claims, we first have to take stock of the evidence that *was* presented—a lengthy endeavor given the voluminous trial record. In doing so, we walk on well-trodden ground: the state court decisions under review and the district court decision below already provide detailed summaries of the evidence. We assume familiarity with those opinions and highlight only the most relevant facts here. We presume that the state courts' account of the facts is accurate, unless the petitioner rebuts this presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Etherly v. Davis*, 619 F.3d 654, 660 (7th Cir. 2010).

*A. The Case against Caffey*

The State's theory at trial was that Williams faked a pregnancy with Caffey's knowledge, and that Williams, Caffey, and Ward planned to kill Debra Evans, steal her unborn child, and pass the child off as Williams and Caffey's. Williams and Caffey were unable to conceive their own child naturally because Williams had had tubal ligation years earlier in connection with a caesarian birth. And Ward was driven to act, according to the State, because he was angry at Debra for preventing him from seeing his son Jordan.

The State's evidence at trial tended to show the following. James Edwards, who lived with Debra and her children in Addison, left for work around 5:30 p.m. on November 16. When he returned at 2:30 a.m. the next morning, two-year-old Jordan greeted him at the door. Edwards found Debra's and Samantha's bodies and immediately called 911. Several

items were missing from the apartment, including Edwards's
Grambling State University Tigers Starter jacket.

*1. The Testimony of Scott and Pruitt*

Williams's friend Patrice Scott and her boyfriend Dwight
Pruitt testified that Williams showed up at their apartment
in Villa Park, Illinois, around 1 a.m. on November 17 accom-
panied by a young boy, who turned out to be Joshua Evans.
Williams was wearing a Starter jacket and a white sweater
spotted with blood. Joshua was wearing a T-shirt, coat, and
boots, but no pants or socks. Scott noticed a gray car parked
outside. Williams told Scott that the boy's mother had been
shot and asked whether he could spend the night at Scott
and Pruitt's home. Scott agreed. Williams said she would
pick Joshua up in the morning. She also claimed to have just
given birth to a baby. (A month earlier, she had told Scott she
was pregnant.)

Scott heard Joshua crying during the night. Joshua was
still crying in the early morning, when he told Scott that he
needed to go home because his younger brother Jordan was
there alone, and because Edwards would not know where he
(Joshua) was. Joshua explained that four burglars had en-
tered his home and cut his mother and sister. Scott asked
who they were, and Joshua answered: "Annette, Levern, and
Fedell," and someone Joshua called "Boo Boo." Joshua re-
peated this statement more than three times. He explained
that he was hiding but came out as the burglars left, ran out-
side, and then bumped into Williams.

Pruitt overheard Joshua's comments from the bedroom,
where Pruitt was watching television with the volume low-
ered. He testified that Joshua said: "Annette"; "Vern"; a

name that sounded like "Vedelle", "Adelle", or "Ladelle"; and a fourth name Pruitt could not make out.

Around 9 a.m. on November 17, Williams returned, driving the same gray car that Scott had seen the night before. Scott told Williams what Joshua had said. Williams became angry, cursed at Joshua, and accused him of lying. Joshua insisted he was telling the truth. Williams told Joshua to take his medicine, but he said he did not take any medicine. Williams led him to the kitchen; the boy soon emerged gagging, went to the bathroom, and vomited. Police later found an empty iodine bottle in the kitchen garbage can.

Williams asked Scott to accompany her to the townhouse where Williams and Caffey lived in Schaumburg, Illinois. Williams explained that she wanted to check on her newborn baby, and that she also had some gifts for Scott's infant daughter Alexis. Scott agreed to go along. She, Williams, and Joshua left the apartment. Scott asked Pruitt to watch Alexis, but he refused, so Scott brought Alexis with her.

While they were gone, Pruitt saw a television report on the Evans murders and recognized Joshua's picture. Pruitt left the apartment looking for a telephone but could not find one that worked. Unsuccessful, he returned home.

When Scott arrived at Williams and Caffey's home, she went upstairs with Williams while Joshua watched Alexis in the living room. Scott testified that she saw Caffey lying on a bed with a "really pale" baby who had "tape across his navel." Scott went back downstairs to feed Alexis. Later, Williams called Scott down to the lower level, where the garage and laundry room were located. Williams asked Scott to bring Joshua downstairs, which she did.

Waiting in the lower-level laundry room were Caffey, Williams, and an unidentified man, who soon left. Scott testified that she heard Caffey ask Williams why she had not taken Joshua "to the projects" as he instructed. Williams explained that Joshua "talked too much" and knew their names. Caffey and Williams then began to strangle Joshua with a white cord. Scott screamed and pushed Williams, forcing her to release her end of the cord. Williams left and returned with a knife. Scott screamed again and asked Williams to take them home. Scott took Joshua upstairs and tried to leave, but the door was locked. Scott went back down to the laundry room with Joshua and Alexis. Caffey warned Scott not to say anything or else he would "get me and my daughters."

Caffey then instructed Williams to take Scott home. They all went to the garage and got into the gray car. Scott was in the front passenger seat with Alexis. Joshua was behind her in the back seat, and Caffey was sitting next to him. Williams was standing along the driver's side and appeared to be holding Joshua. Scott testified that she saw Caffey repeatedly stab Joshua, causing him to gasp and kick the front seat.

Williams then climbed into the driver's seat and drove to Maywood, where she and Caffey took Joshua out of the car, took him to the back of a building, and then returned without him. Williams left Caffey in Maywood and took Scott back to her apartment. They arrived around 12:15 p.m. At Williams's request, Scott gave her cleaning supplies.

Pruitt observed that Scott seemed to be "trying to get rid of [Williams]." Pruitt told Scott to lock the door while he went to call the police. On his way out, he saw Williams cleaning her car. Pruitt called the police from a nearby hair

salon. Scott subsequently led them to the location in Maywood where Williams and Caffey had taken Joshua. Police recovered Joshua's dead body in a nearby alley. They then drove to Williams and Caffey's home and arrested them. At the time of arrest, Williams was carrying Elijah, who had a bloody piece of gauze taped over his navel. Caffey was wearing Edwards's Starter jacket, which had blood stains on the right cuff.

*2. Physical and Forensic Evidence*

The State presented the following physical and forensic evidence. In the Evans apartment, investigators found Williams's bloody fingerprint on a piece of paper. On the sidewalk in front of the apartment, they found a pair of poultry shears covered with Samantha's blood. Police did not find Caffey's fingerprints or DNA in the Evans apartment.

Police searched Williams and Caffey's house. In a garbage bag in the garage, they found a white coaxial cable with Joshua's blood on it; Scott identified it as the cable used to strangle Joshua. In the dishwasher, police recovered a butcher knife, which Scott identified as the knife that Caffey used to stab Joshua. On the kitchen counter were two counterfeit birth certificates stating that Williams gave birth to a baby, fathered by Caffey, on November 16, 1995. The certificates had been prepared on a typewriter belonging to a woman named Vikki Iacullo. In Williams and Caffey's closet, police found a bedsheet and pillowcase that matched the blood-stained sheet discovered seven blocks from Joshua's body. (The blood was Joshua's.) On the backseat carpet in Williams and Caffey's car, police found Joshua's blood, which had been treated with cleaner.

Iacullo and Dorothy Hale later directed police to a lake in Wheaton, where they found the gun used to shoot Debra Evans. Iacullo invoked her Fifth Amendment privilege and refused to testify. She was later charged with obstruction of justice.

Several doctors testified about the forensic evidence. According to them, the main cause of Debra Evans's death was a gunshot wound to the head. She also had multiple stab wounds, including a thirteen-inch jagged incision across her abdomen consistent with poultry shears. Based on blood spatters around Debra's body and the fact that her baby (Elijah) survived, Debra's obstetrician opined that she was still alive when Elijah was cut from her womb. The doctor opined further that two or three sets of hands would have been necessary to perform such a procedure.

Samantha had defensive wounds on her arms and incisions on her neck, which were also consistent with poultry shears. Joshua's neck bore ligature marks consistent with strangulation and stab wounds consistent with a butcher knife. Joshua's right lung was aspirated, meaning he inhaled his own vomit, causing damage consistent with the ingestion of iodine. His wounds and the lack of defensive marks suggested that he may have been restrained.

### 3. Other Witnesses' Testimony

Other witnesses provided additional details about the defendants' activities leading up to and on the night of the murders. Dawn Killeen knew Williams and Caffey because she was their neighbor, and because her husband dealt drugs with Caffey and Ward. Killeen testified that she went to Williams and Caffey's house in May 1995 to borrow a

vacuum cleaner. Ward stormed in "yelling and screaming that Debbie [Evans] wasn't allowing him to see Jordan." Ward "said he was tired of her shit and he wanted to … . kill the bitch." He punched a hole in the wall. Caffey asked Ward whether he wanted a gun or a knife. Vikki Iacullo was also there. Killeen overheard them talking about a baby.

Williams's cousin John Pettaway saw Williams, Caffey, and Ward together on the day of the murders. Pettaway and Ward were together that afternoon, smoking crack cocaine and driving around Wheaton. They twice encountered Caffey and Williams, and on each occasion Ward got out of the car to speak with them for 15 minutes or so. Ward told Pettaway several times that he (Ward) needed to find Caffey.

Kassandra Turner, Williams's friend, testified that Caffey called her on the evening of November 16 to tell her that he and Williams were going to have the baby. Williams had told Turner months earlier that she was pregnant. The following day, Caffey reported to Turner that Williams had given birth to a "real light skinned" baby boy.

Jacci Sullivan and Tennie Clay lived in Evans's apartment complex. Sullivan testified that she heard a shot between 8:30 and 9:30 p.m. on November 16. Clay said she heard voices outside around 9:15 p.m., looked out her window, and saw four people talking on a sidewalk. She believed three were African-American and the other was a light-skinned Hispanic. One of them was wearing a dark Starter jacket.

Joy Wilson, age 15, and her aunt Tiffany Wilson, age 16, were babysitting at Tiffany's house on the night of November 16. Tiffany was Ward's and Williams's cousin. Joy and Tiffany testified that Ward entered the house that night car-

rying a plastic bag stuffed full of what looked like clothing. Joy said she noticed a hole in Ward's pants and blood on his clothes. Ward went to the bathroom and emerged wearing different clothes; the grocery bag appeared fuller. Joy was frightened by the family dog and ran outside. There, she saw a gray car with three people inside: two men in the front and a woman in the back. She later identified two of them as Caffey and Williams. They were honking and calling for Ward. Ward got in the car and they drove off.

Mohammid Siddiqui, a clerk at 7-Eleven in Schaumburg, testified that Caffey and a woman matching Williams's description entered his store on November 17 between 1:30 and 2:00 in the morning. Caffey bought baby wipes and candy. The store register recorded a sale at 1:49 a.m. for one item at $1.99, which is the cost of baby wipes, and one item at $0.99.

Williams called her sister, Tina Martin, around 3:30 a.m. on November 17 and told her the baby had arrived. Tina and her mother drove to Iacullo's house, where they saw Williams, Iacullo, Caffey, and the baby. The baby's complexion was so light that neither Martin nor her mother believed it really was Williams and Caffey's. Tina and her mother left after just a few minutes.

### B. Caffey's Defense

Caffey maintained (and still maintains) his innocence. The defense's theory of the case was that Williams was possessive and jealous, so she planned to trap Caffey by faking a pregnancy, stealing Elijah Evans, and then passing him off as their child. Williams allegedly conspired with Ward and Iacullo to pull off her plan.

The defense introduced evidence of Williams's jealousy. She had good reason to be jealous: Caffey began dating Williams in 1994 but continued to have sexual relationships with other women, including his former girlfriend, Katrina Montgomery, with whom he had a child. Williams did not like Caffey's relationship with Katrina, and the two women had physical and verbal altercations from 1994 through 1995. Williams also had a history of feigning pregnancies, according to Caffey and another witness.

In February 1995, Williams told Caffey she was pregnant. Caffey testified that he did not know about Williams's tubal ligation or her inability to conceive any more children. Williams first told him the baby was due in August but then changed the date to mid-October. When that date passed, Caffey stopped believing she was pregnant.

Caffey testified that he was at home in Schaumburg with Williams's children on the night of the murders. Williams went out around 7:15 p.m. on November 16. Shortly after that, Joyce Hotz came over and bought drugs from Caffey. Then Caffey watched New York Undercover with Williams's daughter Christina from 8 until 9 p.m., when the girl went to bed. At 1:30 a.m., Williams still had not come home. Caffey grew worried and went to the nearby 7-Eleven to use a pay phone. He called Martin and asked her to page Williams. Caffey denied buying baby wipes at that time.

Caffey admitted calling Turner earlier that evening but denied telling her that he and Williams were going to have a baby. According to Caffey, Turner had bought drugs from him the previous day, and he was calling to inform her that her check had bounced. Caffey also admitted to meeting

with Ward earlier in the day, but only to sell drugs—not to plan any murders.

Caffey testified that he saw Iacullo's car pull into his driveway around 2:30 a.m. Caffey went outside and saw Williams in the car with a baby. Back inside the house, Iacullo explained that Williams had gone into labor at Iacullo's house. They went to a hospital, where Williams gave birth, but they had to leave because Williams did not have insurance. Caffey was initially skeptical of their story but seeing the baby's umbilical cord bleeding somehow convinced him it was true. They all went to Iacullo's house to get Williams's car. While there, Williams called Martin and gave her the news.

Caffey testified that he and Williams then left Iacullo's house and returned to the 7-Eleven a little before 5 a.m. It was at that time, according to Caffey, that he bought baby wipes. The store register recorded a purchase of an item for $1.99, the cost of baby wipes, at 4:49 a.m. They returned home, and Caffey fell asleep next to the baby. He stayed there most of the day. That night, Caffey, Williams, and the baby went to Iacullo's house, where Iacullo gave Caffey a Grambling Starter jacket as a "Daddy's Day present." When Williams and Caffey returned home, they were arrested.

In addition to presenting Caffey's version of events, the defense attacked the credibility of the State's witnesses and drew out inconsistencies in their testimony. Patrice Scott admitted on cross-examination that she did not contact the police, despite Joshua's naming of the four burglars, Williams's administration of Joshua's "medicine," and other suspicious behavior. Moreover, Scott did not tell any of the investigating officers who initially interviewed her that

Joshua had named Caffey as one of the burglars. Scott explained that she was afraid to name Caffey because he had threatened to hurt her and her family.

Pruitt admitted that he was serving a prison sentence for a weapons charge, was a gang member, and had prior convictions. He conceded that he did not initially call the police. And when he did eventually call the police, he did not tell them about the names Joshua had mentioned. Nor did he report that information to the investigating officers who initially interviewed him. Pruitt explained, however, that he was not formally interviewed on those occasions.

The defense theorized that Pruitt and Scott were falsely implicating Caffey in the murders, perhaps to minimize their own culpability. Another possible reason was that Scott feared Bo Wilson, who may have been the fourth burglar, the one Joshua called "Boo Boo." Wilson may also have been the unidentified man who was in the laundry room at Williams and Caffey's house. Scott denied that the man was Wilson. But a detective testified that about a month-and-a-half later, Scott told him Wilson was the man in the laundry room.

The defense elicited testimony to impeach other witnesses too. For example, Kassandra Turner, who testified that Caffey called her on November 16 to say that he and Williams were going to have a baby, did not relay that information to police until more than two months after the crimes. Joy Wilson did not initially tell police that she had seen any specific people in the gray car outside Tiffany's house. And Mohammid Siddiqui, the 7-Eleven clerk, recalled seeing Caffey in the store only after police showed him a photograph.

Finally, the defense called witnesses whose testimony tended to show that Iacullo supplied the gun for the murders and disposed of it afterward by throwing it in a pond. She burned several documents in one witness's kitchen but saved a birth certificate with Caffey's name on it. The witnesses also implicated Dorothy Hale in these acts.

After deliberating, the jury found Caffey guilty of the first-degree murder of Evans, Samantha, and Joshua, as well as the aggravated kidnapping of Joshua.

*C. Post-Conviction Procedural History*

In February 2000, Caffey appealed his conviction and sentence to the Illinois Supreme Court. He raised numerous arguments, including that: (1) the trial court improperly excluded hearsay statements made by Ward, Williams, and Iacullo, and thereby deprived Caffey of the ability to mount an effective defense; (2) his trial counsel was constitutionally ineffective for failing to introduce statements by Iacullo and Hale that the trial court had ruled admissible; and (3) the trial court improperly admitted Joshua's hearsay statements naming Caffey as one of the assailants. The Illinois Supreme Court affirmed the trial court's judgment in a detailed opinion. *People v. Caffey*, 792 N.E.2d 1163 (Ill. 2001) ("*Caffey I*"). The U.S. Supreme Court denied Caffey's petition for a writ of certiorari. *Caffey v. Illinois*, 536 U.S. 944 (2002).

In April 2000, while his direct appeal was pending, Caffey filed a petition for post-conviction relief in the Circuit Court of DuPage County. Because Caffey was under a sentence of death, the court appointed counsel to represent him in the post-conviction proceedings. The case was then repeatedly continued. Meanwhile, Caffey served subpoenas,

deposed Pruitt, and gathered other evidence. In 2004, Caffey amended his post-conviction petition. He alleged, among other things, that the State violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that: (1) Pruitt received special benefits because he knew about drug sales to one of the prosecuting attorneys, Assistant State's Attorney ("ASA") Jeffrey Kendall; (2) ASA Thomas Epach interceded to prevent Cook County from prosecuting Scott for Joshua's murder; and (3) Cara Walker told police that Iacullo sold drugs to Kendall and said that she would reveal this information if charged for the Evans murders. The trial court dismissed Caffey's petition for post-conviction relief. The Illinois Appellate Court affirmed, *People v. Caffey*, No. 2–05–0787, slip op. (Ill. App. Ct. Apr. 7, 2008) ("*Caffey II*"), and the Illinois Supreme Court denied Caffey's petition for leave to appeal, *People v. Caffey*, 897 N.E.2d 256 (Ill. 2008).

In September 2009, Caffey filed a petition for a writ of habeas corpus in the Northern District of Illinois. He renewed the arguments enumerated above from his direct appeal and his post-conviction petition in Illinois. The district court granted an evidentiary hearing to further develop the factual basis for Caffey's *Brady* claims relating to Scott and Iacullo. *Caffey v. Atchison*, No. 09 C 5458, 2012 WL 5230298 (N.D. Ill. Feb. 3, 2012) ("*Caffey III*"). After discovery, Caffey dropped the *Brady* claim concerning Scott, leaving only the claims concerning Pruitt and Iacullo.

On October 7, 2013, the district court denied Caffey's habeas petition on the merits. *Caffey v. Harrington*, No. 09 C 5458, 2013 WL 5529760 (N.D. Ill. Oct. 7, 2013) ("*Caffey IV*"). The court acknowledged, however, that its ruling was "fairly

debatable," so it granted a certificate of appealability. *Id.* at *34.

This appeal followed. Caffey renews all of his arguments below, except for the portion of his ineffective-assistance claim concerning Dorothy Hale and his challenge to the admission of Joshua Evans's hearsay statements.

## II. ANALYSIS

We review *de novo* a district court's denial of a habeas corpus petition. *Smith v. McKee*, 598 F.3d 374, 381 (7th Cir. 2010). A state prisoner is entitled to seek habeas relief on the ground that he is being held in violation of federal law or the U.S. Constitution. 28 U.S.C. § 2254(a). But if a state court has already adjudicated the petitioner's claim on the merits, the Antiterrorism and Effective Death Penalty Act ("AEDPA") precludes habeas relief unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Clearly established Federal law" refers to the holdings of the Supreme Court that existed at the time of the relevant state court adjudication on the merits. *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A decision is "contrary to" federal law if the state court applied an incorrect rule—*i.e.*, one that "contradicts the governing law" established by the Supreme Court—or reached an outcome different from the Supreme Court's conclusion in a case with "materially indistinguishable" facts. *Williams*, 529 U.S. at 405–06. A state court unreasonably applies federal

law when it "identifies the appropriate standard but applies it to the facts in a manner with which a reasonable court would disagree." *Etherly v. Davis*, 619 F.3d 654, 660 (7th Cir. 2010) (citing *Williams*, 529 U.S. at 413, and *Williams v. Thurmer*, 561 F.3d 740, 742–43 (7th Cir. 2009) (per curiam)). Mere error is not enough to overcome AEDPA deference; instead, the state court's decision must be objectively unreasonable, *Etherly*, 619 F.3d at 660, meaning it is "beyond any possibility for fairminded disagreement," *Mosley v. Atchison*, 689 F.3d 838, 844 (2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Where a state court's decision is "contrary to" federal law, or where no state court adjudicated the particular claim on the merits in the first place, AEDPA deference does not apply. *See Ruhl v. Hardy*, 743 F.3d 1083, 1091 (7th Cir. 2014); *Mosley*, 689 F.3d at 844. In that event, we review the petitioner's claim under the pre-AEDPA standard of 28 U.S.C. § 2243 and dispose of the matter "as law and justice require," which is essentially *de novo* review. *Eichwedel v. Chandler*, 696 F.3d 660, 671 (7th Cir. 2012) (citing *Morales v. Johnson*, 659 F.3d 588, 599 (7th Cir. 2011)).

With those principles in mind, we turn to the issues on appeal.

*A. Exclusion of Hearsay Statements*

Caffey contends, first, that the trial court improperly excluded several hearsay statements by Iacullo, Ward, and Williams. According to Caffey, the Constitution guaranteed him the right to present those statements to the jury. We disagree.

*1. The Right to Present a Defense*

A criminal defendant has a constitutional right, grounded in the Sixth and Fourteenth Amendments, to "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks and citation omitted). That includes the right to present relevant evidence. *United States v. Scheffer*, 523 U.S. 303, 308 (1998). Of course, that right is not unfettered but is instead subject to the states' "broad latitude … to establish rules excluding evidence from criminal trials." *Id.* In some instances, however, strict application of a state evidentiary rule must yield to the defendant's constitutional rights.

The leading example is *Chambers v. Mississippi*, 410 U.S. 284 (1973), where the Supreme Court vindicated a defendant's right to present reliable, critical evidence that would otherwise have been excluded by a state hearsay rule. Leon Chambers was convicted of murdering a police officer during a melee in a local bar. One witness testified that he saw Chambers shoot the officer. 410 U.S. at 286. But another man named McDonald had confessed to the murder on several occasions, including in a sworn statement to Chambers's counsel. McDonald was arrested but later repudiated his confession. *Id.* at 287–88.

Chambers called McDonald as a witness at trial. The court admitted McDonald's written confession into evidence, but McDonald again repudiated it. The court prevented Chambers from cross-examining McDonald and challenging his repudiation based on the common-law "voucher rule" that a party may not impeach his own witness. *Id.* at 295. Chambers then sought to introduce the testimony of three witnesses to whom McDonald had admitted he was the

shooter. The trial court excluded their testimony as hearsay. *Id.* at 298.

On direct appeal, the Supreme Court reversed. It held that the prohibition on cross-examination of McDonald plus the exclusion of his hearsay confessions violated Chambers's constitutional right to present a defense. *Id.* at 302. The confessions, although hearsay, bore "considerable assurance of their reliability." *Id.* at 300. Specifically, the statements were: (1) made spontaneously to a close acquaintance shortly after the shooting; (2) corroborated by other evidence, including McDonald's written confession and the testimony of an eyewitness; and (3) "self-incriminatory and unquestionably against interest," which made the statements more reliable and brought them "well within the basic rationale of the [hearsay] exception for declarations against interest." *Id.* at 300–02. Moreover, (4) McDonald was present in the courtroom and under oath, so he could have been cross-examined by the prosecution. *Id.* at 301. The Court emphasized that this final factor "significantly distinguish[ed]" *Chambers* from cases where the declarant was unavailable at trial. *Id.*

The Court also found that the excluded testimony was "critical to Chambers' defense." *Id.* at 302. The proof at trial excluded the possibility that there was more than one shooter, so McDonald's incriminating confession also tended to exculpate Chambers. *Id.* at 297. In these circumstances, the Court held, "the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* at 302.

*Chambers* is one case in a line of Supreme Court decisions considering constitutional challenges to state evidentiary rules. Sometimes the rule has had to yield. *See, e.g.*, *Washington v. Texas*, 388 U.S. 14, 22 (1967) (rejecting rule that accom-

plices may testify for prosecution but not for defense); *Green v. Georgia*, 442 U.S. 95, 97 (1979) (per curiam) (rejecting exclusion of hearsay confession); *see also Kubsch v. Neal*, No. 14-1898, 2015 WL 4747942, *10 (7th Cir. Aug. 12, 2015) (collecting cases). But those instances are "rare[]." *Nevada v. Jackson*, 133 S.Ct. 1990, 1992 (2013) (per curiam).

The general standard is that rules of evidence restricting the ability to present a defense cannot be "arbitrary" or "disproportionate to the purposes they are designed to serve." *Scheffer*, 523 U.S. at 308. The exclusion of hearsay transgresses that standard only where the excluded statements: (1) bear "considerable assurance of their reliability," sufficient to compensate for not being subject to cross-examination or given under oath; and (2) are "critical" to the defense. *Chambers*, 410 U.S. at 299–300, 302.

The *Chambers* Court identified four factors to help assess reliability, although that list is not exhaustive. *Sharlow v. Israel*, 767 F.2d 373, 377 (7th Cir. 1985). We already discussed those four factors above. The Court also clarified what it means by "critical" evidence in *United States v. Valenzuela-Bernal:* evidence is critical if it is "favorable and material," in the sense that "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." 458 U.S. 858, 872–74 (1982); *see also Scheffer*, 523 U.S. at 1264 (stating that exclusion of evidence is unconstitutional "only where is has infringed upon a weighty interest of the accused"); *Green*, 442 U.S. at 97 (finding constitutional violation where excluded hearsay was "highly relevant to a critical issue"); *Washington*, 388 U.S. at 16 (finding violation where evidentiary rule excluded testimony that was "relevant," "material," and "vital" to defense); *Sharlow*, 767 F.2d

at 377–78 (recognizing that *Valenzuela-Bernal* standard de-
fines "critical" for purposes of *Chambers* analysis). The
*Chambers* "critical" standard is thus the same as the material-
ity requirement employed in the *Brady* line of cases, as we
recognized in *Harris v. Thompson*, 698 F.3d 609, 627–28 (7th
Cir. 2012).

Deciding whether excluded hearsay is sufficiently relia-
ble and material to trigger a *Chambers* violation in a given
case is a fact-intensive inquiry. *Montana v. Egelhoff*, 518 U.S.
37, 52 (1996) (reading *Chambers* as "an exercise in highly
case-specific error correction"). It requires balancing the
state's legitimate interests against the hearsay statement's
trustworthiness and importance to the defendant *See Shar-
low*, 767 F.2d at 377 (citing *Chambers*, 410 U.S. at 302).

### 2. Iacullo's Statements to the Police

After the police arrested Williams and Caffey, they ques-
tioned Vikki Iacullo on November 18, 1995, and several
times thereafter. Iacullo gave the following account to the
police: Williams arrived at Iacullo's house early on Novem-
ber 17 with a baby. The baby's umbilical cord was bleeding,
so Iacullo supplied gauze and tape. Williams had a cut on
her hand and blood on her shirt. Iacullo drove Williams
home and, once there, presented the baby to Caffey, saying,
"Surprise, Baby Fedell Jr." Williams gave Iacullo Edwards's
Grambling Tigers Starter jacket and told her to present it to
Caffey as a "new daddy present," which Iacullo did. Also, at
Williams's behest, Iacullo prepared a false birth certificate
and gave it to Williams outside of Caffey's presence. *See
Caffey I*, 792 N.E.2d at 1192.

The State charged Iacullo with obstruction of justice for her role in these crimes. She invoked the Fifth Amendment and refused to testify on Caffey's behalf. Defense counsel then sought to introduce Iacullo's out-of-court statements to the police, but the trial court excluded them as inadmissible hearsay under Illinois law.

On direct appeal, the Illinois Supreme Court affirmed their exclusion. *Id.* at 1198. The court acknowledged that state hearsay rules must sometimes yield to a defendant's constitutional right to present a defense under *Chambers*. But the court found that Iacullo's hearsay statements lacked sufficient indicia of reliability: three of the four reliability factors identified in *Chambers* were missing. *Id.* at 1192–95. In particular, the court found that Iacullo's statements were not self-incriminating because "[t]here is no crime in: allowing into one's home a friend who claims to have just given birth; helping to bandage a baby; driving that friend to her home and presenting the baby to the alleged father; or giving someone a jacket." *Id.* at 1194. The court did find the statement regarding the false birth certificate to be "somewhat self-incriminating" but insufficient to satisfy *Chambers*. *Id.*

The district court below disagreed. It concluded that the Illinois Supreme Court unreasonably applied *Chambers* and *Williamson v. United States*, 512 U.S. 594 (1994), which teaches that "whether a statement is self-inculpatory or not can only be determined by viewing it in context." *Caffey IV*, 2013 WL 5529760, at *17–18. The district court therefore assessed the issue *de novo* and concluded that Iacullo's statements "bore considerable assurances of trustworthiness when assessed in the way that *Williamson* requires." *Id.* Nevertheless, the district court found the statements immaterial because there

was no reasonable likelihood that they could have affected the jury's verdict. *Id.* at *18–19. Therefore, the district court ultimately found no *Chambers* violation. *Id.* at *19.

*a) Reliability*

Unlike the district court, we think the Illinois Supreme Court reasonably applied *Chambers* in finding the excluded statements unreliable, although it is close question. We consider the four *Chambers* factors in turn. The first was missing: these were not spontaneous statements to a close acquaintance, but rather answers given during interrogation by the police.

The second factor, corroboration, was present. Caffey testified that he first encountered the baby when Iacullo presented it to him at 2:30 a.m., and that Iacullo gave him the Starter jacket as a gift. This is some corroboration of Iacullo's statements but not much. Compare *Chambers*, where there was a sworn confession, eyewitness testimony, and other evidence to corroborate McDonald's three hearsay confessions. 410 U.S. at 300. *See also Kubsch*, 2015 WL 4747942, at *13 (holding that exclusion of hearsay was constitutional where, among other reasons, there was only "minimal corroboration" for excluded statement).

The third factor—whether Iacullo's statements were self-incriminating—is disputed. We agree with the district court that Iacullo's statements were at least somewhat against her penal interest. There was evidence linking Iacullo to the murders—*e.g.*, showing that she provided and then disposed of the gun used to kill Debra Evans. The police had already arrested Williams and Caffey, and by the time they were questioning Iacullo, it was apparent they suspected she too

was involved. Viewed in this context, Iacullo's statements that she presented the baby to Caffey and gave him the jacket tend somewhat to implicate her, at least in the kidnapping of Elijah Evans, if not in the larger conspiracy.

On the other hand, the statements did not implicate Iacullo in the murders themselves; in that way, they are considerably less self-incriminating than the confessions at issue in *Chambers*. *See* 410 U.S. at 300–01. Moreover, Iacullo was in custody when she made the statements and likely knew she was a suspect. She may therefore have had a motive to falsify or embellish her testimony to curry favor or gain leverage with the police. Her statements could also be interpreted as a form of damage-control, a way of downplaying her actual role in the crimes, which may have been greater, by admitting to a lesser role. Caffey argues that if Iacullo had really wanted to gain leverage she would have implicated him in the crimes to take the heat off herself. Not necessarily. Perhaps, for example, Iacullo did not want to turn Caffey against her for fear that he would reveal information about her involvement. The fact that she did not implicate him does not bolster the veracity of Iacullo's statements.

Turning to the fourth factor, it is undisputed that Iacullo, having invoked the Fifth Amendment, was unavailable for cross-examination at Caffey's trial. "The availability of cross-examination was … central to *Chambers*." *Kubsch*, 2015 WL 4747942, at *14. But here, that "powerful assurance of reliability," *id.*, was missing.

In these circumstances, we think it is a close question whether Iacullo's hearsay statements were sufficiently reliable to trigger a *Chambers* violation. But for that very reason,

we cannot say that the state court's conclusion on this point was objectively unreasonable.

*b) Materiality*

Additionally, we agree with the district court that Iacullo's statements were not sufficiently material to Caffey's defense to trigger a *Chambers* violation. Because the state supreme court rested its holding on its finding of unreliability, it did not consider the statements' materiality. We therefore review that issue *de novo*.

As a threshold matter, Caffey contends that he does not have to show that Iacullo's statements were *material*, but only that their exclusion had a "substantial and injurious effect" on the jury's verdict. Federal courts generally employ the latter standard, taken from *Brecht v. Abrahamson*, 507 U.S. 619 (1993), to determine whether a constitutional error is harmless or prejudicial in habeas corpus cases under § 2254. *Fry v. Pliler*, 551 U.S. 112, 121–221 (2007). The materiality requirement of *Chambers*, however, is not the same as harmless-error analysis. Caffey's argument wrongly substitutes the latter for the former. *Chambers* materiality sets a higher bar than *Brecht*: Caffey must show a reasonable likelihood that the excluded evidence could have affected the verdict. *Valenzuela-Bernal*, 458 U.S. at 874.[1]

---

[1] That is why "*Chambers* error is by nature prejudicial." *Fry*, 551 U.S. at 124 (Stevens, J., concurring in part and dissenting in part). An evidentiary ruling that unconstitutionally excludes critical evidence under *Chambers* is necessarily harmful under *Brecht*. Cf. *Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995) (making the same observation about *Bagley* error).

Caffey contends that Iacullo's statements constituted the only corroboration for his version events. It is true that her statements, if accepted by the jury, would have supported his explanation of why he was wearing the blood-stained Starter jacket taken from the Evans apartment on the night of the murders—which was one important piece of physical evidence against him. Iacullo's statements also would have corroborated Caffey's story that Williams and Iacullo presented the baby to him at 2:30 a.m., which would tend to support Caffey's claim that he did not know about the baby before then.

Iacullo's statements would not, however, have corroborated the rest of Caffey's story. Nor, crucially, would they have undermined the other powerful evidence against him, including:

- Patrice Scott and Dwight Pruitt's testimony that Joshua identified Caffey as one of the burglars who cut his mother and sister;

- Scott's eyewitness testimony that Caffey strangled and stabbed Joshua, then took him to the alley in Maywood where his body was eventually found;

- The testimony of the 7-Eleven clerk that Caffey and Williams entered his store around 1:30 a.m. and bought baby wipes—an hour before Caffey claims he even knew about the baby's arrival;

- Dawn Killeen's testimony that months before the murders she heard Caffey (perhaps in jest) ask Ward whether he wanted a gun or a knife to kill Debra Evans, and then overhead Caffey, Williams, Ward, and Iacullo talking about a baby;

- John Pettaway's testimony that he saw Caffey with Williams and Ward on the day of the murders, and that Ward said he needed to find Caffey;

- Kassandra Turner's testimony that Caffey called her on the evening of the murders to say that the baby was on its way;

- Tennie Clay's sighting of a light-skinned individual matching Caffey's complexion with three other African-Americans, one of whom had a Starter jacket, on the sidewalk outside the Evans apartment on the night of the murders;

- Joy Wilson's testimony that she saw Caffey in the gray car with Williams and Ward, who had blood on his clothes, on the night of the murders; and

- The implausibility of certain parts of Caffey's testimony—for example, his claim that he did not know about Williams's tubal ligation despite dating her for roughly a year, and his claim that he believed Elijah was his child despite his initial skepticism and even though others who saw the baby thought he was too light-skinned to belong to Williams and Caffey.

Caffey points to weaknesses in the State's case—*e.g.*, prior inconsistent statements by witnesses, possible biases, and motives they may have had to lie. In particular, neither Scott nor Pruitt told the officers who originally questioned them that Joshua had identified Caffey as one of the assailants. The problem with Caffey's argument is that the jury heard all of this impeachment evidence yet still found Caffey guilty beyond a reasonable doubt. Caffey does not claim that the

evidence was insufficient to sustain his conviction. Moreover, he has given us no reason to think that the admission of Iacullo's excluded hearsay statements would have changed the jury's evaluation of the evidence or the witnesses, or that it might have tipped the balance in Caffey's favor. In short, there is no reasonable probability that the excluded statements would have altered the outcome of Caffey's trial—we are confident he still would have been convicted.

The fact that the prosecution in its closing argument emphasized the lack of corroboration for Caffey's story does not change our analysis. The State also argued that the evidence of Caffey's guilt was overwhelming. As we read the record, the jury did not merely opt for the State's theory of the case because Caffey's theory lacked corroboration. No; the prosecution prevailed because it presented strong, positive proof of Caffey's participation in the crimes.[2]

In sum, the Illinois Supreme Court did not "mechanistically" apply its hearsay rule to exclude Iacullo's statements to the police. *Chambers*, 410 U.S. at 302. Those statements bore insufficient indicia of reliability and lacked the exculpatory significance necessary to support a constitutional claim under *Chambers*. We therefore affirm the denial of habeas relief on this claim. We now turn to Caffey's other *Chambers* arguments, which we can dispose of more quickly.

---

[2] Nor are we troubled by the isolated reference in the State's closing argument to Iacullo's race (white), for the reasons given by the Illinois Supreme Court. *See Caffey I*, 792 N.E.2d at 1197.

*3. Ward's and Williams's Statements*

The trial court excluded (1) John Pettaway's testimony that on the afternoon of the murders Ward said he needed to find Caffey to buy drugs from him; and (2) the testimony of Williams's friend Kimberly Young that Williams said she would fake a pregnancy to keep a man. Caffey contends the first statement supports his claim that he and Ward met only to sell drugs, not to plan murders. Caffey contends the second statement corroborates his testimony that Williams duped him into believing she was pregnant.

The Illinois Supreme Court affirmed the exclusion of both statements. *Caffey I*, 792 N.E.2d at 1188–92. It held that no state law hearsay exception applied, and it found further that any error was harmless because the statements were merely cumulative of other evidence. Although the court analyzed the issues under state law rather than *Chambers*, its harmless-error analysis was essentially the same as the *Chambers* materiality inquiry. So the state supreme court's conclusion still deserves AEDPA deference. *See Gilbert v. Merchant*, 488 F.3d 780, 793 n.2 (7th Cir. 2007) (noting that state court need not cite federal cases so long as its analysis is consistent with Supreme Court precedent).

The district court thought the state court's ruling was a reasonable application of federal law. We do too. The jury heard testimony from Pettaway that he and Ward smoked crack together and that Ward bought drugs from Caffey. Caffey also testified that he sold drugs to Ward. Thus, there was already ample evidence from which the jury could draw the inference that Caffey's meetings with Ward concerned drugs. Ward's excluded hearsay statements would not have added anything material to that evidence. Nor would the

fact that Ward and Caffey's meetings concerned drugs exclude the possibility that they also concerned the Evans murders.

As for Williams's excluded statement, Caffey presented evidence at trial of Williams's jealousy, and Caffey and other witnesses testified that she had faked pregnancies before. So the jury was already aware of the possibility that Williams would use a sham pregnancy to trap Caffey. The jury simply did not believe that story in light of all the evidence. Williams's hearsay statement would have added nothing material to the defense's argument. There is no reasonable probability that Williams's excluded statement would have changed the verdict.

For these reasons, we find no *Chambers* violation in the trial court's exclusion of Ward's and Williams's hearsay statements.

### B. Ineffective Assistance of Counsel

Before trial Caffey's counsel sought admission, under exceptions to the hearsay rule, of several out-of-court statements that Iacullo made to friends. Ryan Berger would have testified that a few hours before Debra Evans's murder, Iacullo asked him how to clean fingerprints off a gun; and between midnight and 4 a.m. the next day, she asked him how to clean powder burns off her hand.

Patricia Mitchell stated that Iacullo said she found a gun under the front seat of her car and was concerned her fingerprints might be on it.

Dorothy Hale stated that Iacullo told her to get cleaner to wipe fingerprints off a gun, bullets, and a magazine.

David Drenk stated that in the early fall of 1995, Iacullo asked to borrow a gun. A week before the murders, she asked him whether he could obtain a false birth certificate; he said no. On the day of the murders, November 16, 1995, he saw Williams at Iacullo's apartment. On November 17, Iacullo asked Drenk for help getting a birth certificate; the next day she told him how she would go about falsifying a birth certificate herself. A few days later, Iacullo told Drenk she was going to throw the gun into the Fox River.

The trial court ruled that these statements were admissible, but defense counsel did not present them to the jury. Caffey argues that this was an error and that it deprived him of his constitutional right to effective assistance of counsel. We assess ineffective-assistance claims by asking (1) whether counsel's performance fell below an objectively reasonable standard; and (2) whether there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). By "reasonable probability" we mean "a probability sufficient to undermine confidence in the outcome." *Id*.

The Illinois Supreme Court rejected Caffey's claim for failure to meet the second prong. *Caffey I*, 792 N.E.2d at 1198. The district court below agreed with that conclusion. *Caffey IV*, 2013 WL 5529760, at *20. We afford AEDPA deference to the state court's ruling regarding *Strickland* prejudice, but not regarding the first prong, which the state court did not address.

We do not know why trial counsel decided (assuming it was a decision and not an oversight) not to present Iacullo's statements to the jury. Neither side has identified a strategic

reason or given any other explanation. It seems a questionable move, particularly after counsel went to the trouble of obtaining the right to admit the statements into evidence. Counsel might have used Iacullo's statements, for instance, to argue that she was present in the apartment during the murders, which might have cast some doubt on the accuracy of Joshua's statement identifying the four "burglars," because Iacullo was not one of people he named. But even if counsel's conduct was objectively unreasonable (which we do not decide), we find no error in the state court's holding that Caffey suffered no *Strickland* prejudice.

Iacullo's statements tend to show her involvement in the crimes, specifically in obtaining and disposing of the gun and in fabricating birth certificates, though evidence to that effect was already presented at trial. Iacullo's statements could also be interpreted to show that she participated in the planning of the murders, or perhaps even that she fired the gun. In short, the statements tend to inculpate Iacullo. But they do not tend to exculpate Caffey, which is what matters here. This is not a case like *Chambers*, where the evidence pointed to only a single participant in the shooting, so that hearsay statements tending to implicate another shooter necessarily also tended to exculpate the defendant. 410 U.S. at 297. The evidence here shows that several people participated in the Evans murders, the planning, and the cover-up. The fact that Iacullo may have been one of them does not exclude Caffey as another participant—and there was ample evidence that he was. In these circumstances, the state court reasonably applied *Strickland* in finding no prejudice. Therefore, Caffey's ineffective-assistance claim fails.

*C. Caffey's* Brady *Claims*

Caffey next argues that the State wrongfully withheld evidence relating to Dwight Pruitt and Vikki Iacullo. The Supreme Court held in *Brady v. Maryland,* 373 U.S. 83 (1963), that due process requires the prosecution to disclose evidence favorable to the defense. *Kyles v. Whitley*, 514 U.S. 419, 432–33 (1995). Both exculpatory and impeachment evidence qualify as "favorable." *Id.* at 433. Suppression of such evidence violates *Brady,* however, only where the evidence is material, meaning "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A "reasonable probability" exists where suppression of the evidence "undermines confidence in the outcome of the trial." *Id.* at 434 (quoting *Bagley*, 473 U.S. at 678).

*1. Benefits Received by Pruitt*

In his petition for post-conviction relief in Illinois, Caffey alleged that the State suppressed evidence of two benefits it had given to Dwight Pruitt: favorable treatment in the Du-Page County Jail and non-prosecution for his involvement in drug sales to ASA Kendall, one of Caffey's prosecutors. Caffey claims he could have used this evidence at trial to impeach Pruitt's credibility, establish his bias in favor of the prosecution, and show that he may have falsified or embellished his testimony in exchange for the benefits he received.

The state trial court allowed Caffey to develop his claim by taking Pruitt's deposition. Pruitt testified, in relevant part, as follows. Years before Caffey's trial, Pruitt twice drove a man he knew as "Black" to a meeting point to sell cocaine to

a buyer who Pruitt later learned was ASA Kendall. Pruitt saw Black and Kendall meet but did not witness hand-to-hand drug transactions. Pruitt later told one of the State's attorneys what he had seen, but the attorney told him "not to worry about it" and to discuss the matter no more. Pruitt was never prosecuted for his role in the drug transactions.

Pruitt further testified that at the time of Caffey's trial, Pruitt was incarcerated on a gun charge in the DuPage County Jail. While there, he believed he received better treatment than the other prisoners. He was allowed to take "off the deck" showers three or four times; he ate "restaurant food" while in the courthouse being interviewed or preparing for trial; he was permitted to smoke and make telephone calls; and he was allowed a personal visit with Scott and his daughter in the courthouse with an attorney for the State present. When Pruitt was involved in an altercation with a correctional officer, he received no formal discipline, though he was placed in segregation. One of the State's attorneys told Pruitt that he was "getting the VIP treatment."

Pruitt insisted that his testimony at Caffey's trial was "strictly the truth." He said no one in the prosecutor's office ever asked him to lie or promised him anything in exchange for his testimony: "They never asked me to lie. They never told me to make up nothing … . I wasn't paid or nothing."

After reviewing the evidence, the state trial court dismissed Caffey's petition on the merits. The Illinois Appellate Court affirmed, concluding that the undisclosed evidence was immaterial under *Brady*. *Caffey II*, slip. op. at 41–52. Giving AEDPA deference to that conclusion, the district court held that it represented a reasonable application of federal law. *Caffey IV*, 2013 WL 5529760, at *33–34. We agree.

To be sure, Pruitt's testimony was important to the prosecution's case. He and Scott were the only witnesses who testified to Joshua Evans's identification of Caffey as one of the assailants who killed Debra and Samantha. But for several reasons, we do not think it reasonably probable that the undisclosed evidence about the benefits Pruitt received would have affected the jury's verdict.

In the first place, Pruitt had only minimal personal knowledge about the drug transactions involving Kendall— he never saw drugs or money change hands. Similarly, Pruitt's benefits in jail were relatively minor. A few good showers, decent food when in court, smoking privileges, telephone calls, one family visit, and reduced discipline—we do not think these are powerful enough incentives to have convinced a jury that Pruitt falsified his testimony, at least not without evidence of some kind of *quid pro quo*.

There was no such evidence. On the contrary, Pruitt testified that he had no deal or understanding with prosecutors to testify in a particular way at Caffey's trial. Pruitt said he testified truthfully. To back up that claim, there was the testimony Pruitt gave during a pretrial hearing on the admissibility of Joshua Evans's hearsay statements. That hearing took place before Pruitt's stint in DuPage County Jail and before Pruitt realized that ASA Kendall was the man involved in the drug transactions—that is, before he received or had reason to expect any benefits from the State. Yet, Pruitt's pretrial testimony was consistent with his later testimony at Caffey's trial. Additionally, Pruitt's testimony was corroborated by Patrice Scott.

Considering all these circumstances together, we conclude that the state court reasonably found the undisclosed

evidence concerning Pruitt to be immaterial. Therefore, Caffey's *Brady* claim regarding Pruitt fails.

*2. Iacullo's Statements to Cara Walker*

Finally, Caffey argues that the State violated *Brady* by not disclosing statements that Vikki Iacullo made to Cara Walker, the mother of Iacullo's daughter's friend. On the weekend of November 18, 1995, Iacullo asked Walker to watch her daughters for a few days. Iacullo explained that she was in a bit of trouble. Walker agreed. During the girls' stay, Walker stopped by Iacullo's home to get them some clothes. While there, Walker spoke with Iacullo. Walker later (but before Caffey's trial) reported to the police what Iacullo had said. According to Walker, Iacullo claimed knowledge of and possibly involvement in the Evans murders. Furthermore, Iacullo said that if she were arrested or charged, she would reveal that she had knowledge of illegal drug use by DuPage County prosecutors, including Kendall.[3]

Iacullo's statements to Walker were never disclosed to Caffey before or during his trial. He claims that he was entitled to them under *Brady* and that they were material to his defense because they would have bolstered his case for the admission of Iacullo's statements to the police (discussed in section II.A.2 above). The state court did not address this claim on the merits but instead dismissed it on procedural

---

[3] At the hearing before the district court, Kendall testified that he never bought drugs from Iacullo or Pruitt but asserted his privilege against self-incrimination regarding his prior drug use generally. *See Caffey IV*, 2013 WL 5529760, at *30.

grounds.[4] The district court therefore reviewed the issue *de novo*, held an evidentiary hearing, heard from multiple witnesses, and made factual findings. The district court ultimately rejected Caffey's claim because it regarded the statements at issue as immaterial. *Caffey IV*, 2013 WL 5529760, at *31–32.

We agree with the district court's conclusion and analysis. Iacullo's statements to Walker would have added little to the reliability analysis under *Chambers* and nothing to the materiality analysis. So Iacullo's statements to the police still would have been inadmissible. But Caffey argues that the statements somehow show foul play by the prosecution. Caffey's argument is sketchy, but he seems to suggest that the prosecution procured Iacullo's unavailability at trial, and ensured her silence about Kendall's drug use, in exchange for an agreement not to charge her with murder.

As the district court found, there is no evidence of any such agreement. Nor do the facts plausibly suggest the existence of a tacit agreement or understanding. There is nothing untoward about Iacullo's invocation of her Fifth Amendment privilege; she was, after all, charged with obstruction of justice and may have been guilty of worse. And there is nothing suspicious about the fact that Iacullo was not charged with murder. One of the prosecutors testified before the district

---

[4] The State argues that the state law procedural grounds supply an independent and adequate basis for us to reject Caffey's claim here without even reaching the *Brady* issue. *See Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). The district court disagreed. *Caffey III*, 2012 WL 5230298, at *12–13. We need not decide this issue because we hold that Caffey's *Brady* claim fails on the merits in any event.

court that the State considered bringing such charges but decided not to because it could not place Iacullo at the murder scenes.

We agree with the district court that Iacullo's statements to Walker were immaterial, so we reject Caffey's *Brady* claim regarding Iacullo.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the denial of Caffey's petition for a writ of habeas corpus.